UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| WILLIE SAMPSON,<br><br>                    Petitioner,<br>        v.<br><br>JOHN HENLEY[1], *et al.*,<br><br>                    Respondents. | Case No. 3:20-cv-00615-MMD-CSD<br><br>ORDER |

I.      SUMMARY

Petitioner Willie Sampson filed a counseled Third Amended Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254. (ECF No. 88 ("Petition")). Sampson was sentenced to 30 years to life imprisonment after a Nevada jury convicted him after a second trial of First-Degree Kidnapping, two counts of Lewdness with a Child under the Age of 14, Attempted Sexual Assault of a Minor under the age of 14, and Sexual Assault of a Minor under the age of 14. (ECF Nos. 37-5, 37-9.) The Court now grants a writ of habeas corpus on Ground 5 of the Petition, dismiss all other grounds as procedurally defaulted, and grants a Certificate of Appealability ("COA") on Grounds 4 and 8.

---

[1]According to the state corrections department's inmate locator page, Sampson is incarcerated at Northern Nevada Correctional Center. *See NDOC Inmate Search*, https://ofdsearch.doc.nv.gov/form.php. The department's website reflects John Henley is the warden for that facility. *See Northern Nevada Correctional Center Facility, Nevada Department of Corrections*, https://doc.nv.gov/facilities/nncc_facility/. The Court will therefore direct the Clerk to substitute John Henley for respondent Nathanjah Breitenbach, under, *inter alia,* Rule 25(d) of the Federal Rules of Civil Procedure.

**II.     BACKGROUND[2]**

**A.     Facts Underlying the Offenses**

On February 24, 2002, 12-year-old P.T.[3] was at a bus stop when Sampson approached in his vehicle and asked for the location of the nearest McDonald's restaurant. (ECF No. 35-1 at 50-54.) P.T. never saw Sampson before, gave him directions, and Sampson asked whether P.T. wanted something to eat. (*Id.* at 54-55.) P.T. did not think anything bad would happen because Sampson was nice. (*Id.*) Sampson exited his vehicle, opened the car door, P.T. got inside, and they drove to McDonald's where Sampson purchased take-out meals and then went to Sampson's house to eat. (*Id.* at 54-57.) Before they left McDonald's Sampson told P.T. he would pay him $10 to sweep leaves in front of his yard. (*Id.*) P.T. agreed and did not think anything bad would happen because Sampson seemed genuine and bought the McDonald's food. (*Id.*)

While eating the McDonald's food at the kitchen table at Sampson's house, Sampson left the kitchen and returned with a black revolver he placed to P.T.'s head and told P.T., "Do what I say." (*Id.*) P.T. did not feel he could run away because Sampson had a gun, he was in Sampson's house, and Sampson was larger than P.T. (*Id.* at 58-59.) P.T. identified the firearm as the firearm depicted in a photograph that police found in Sampson's residence later that day. (*Id.* at 84, 142-43.)

Sampson blindfolded P.T. with something white, disrobed P.T., and placed P.T. into a bathtub. (*Id.* at 59-60, 101-03.) Sampson joined P.T. in the bathtub, faced him, and

---

[2]The Court summarizes the relevant state-court record solely as background for consideration of the issues in this case. The Court makes no credibility or factual findings regarding the truth or falsity of evidence or statements of fact in the state court. No assertion of fact made in describing statements, testimony, or other evidence in the state court constitutes a finding by the Court. Failure to mention a specific piece of evidence or category of evidence does not signify the Court overlooked it in considering the issues.

[3]The Local Rules state that "[p]arties must refrain from including—or must partially redact, where inclusion is necessary—[certain] personal-data identifiers from all documents filed with the court, including exhibits, whether filed electronically or in paper, unless the court orders otherwise." LR IC 6-1. The rule directs only the initials of minors should be used. *Id.* "P.T." and "D.T." were minors at the relevant time. LR IC 6-1(2).

washed P.T.'s entire body, including P.T.'s penis, with a washcloth. (*Id.* at 60-61.) Sampson dried off P.T.'s entire body and took him to a bedroom where P.T. was told to lay face down on the bed. (*Id.* at 59, 61-62.) P.T. was worried about the gun. (*Id.*) Sampson rubbed lotion on P.T.'s body, but not his penis. (*Id.* at 62-63.) From beneath P.T. Sampson performed fellatio on P.T. (*Id.* at 69, 108-09, 117-18.) Sampson forced P.T. to masturbate, Sampson tried to place his penis in P.T.'s mouth, and instructed P.T. to perform fellatio, but P.T. refused. (*Id.* at 64-65, 69, 113.) P.T. did not know whether Sampson ejaculated but felt something wet. (*Id.* at 65-66.) P.T. asked to go home but Sampson threatened to tape his mouth and said, "Oh, just be quiet and do what I say." (*Id.* at 68, 71.) Sampson put a shirt and bathrobe on P.T. and took him to the living room to watch cartoons. (*Id.* at 63, 69-70, 77-78.) Sampson asked P.T. what music he listens to and turned the radio to 97.5, a station for rap and hip-hop music. (*Id.* at 70, 84-85.)

Sampson subsequently took P.T. to a different room where P.T. asked for candy, but Sampson did not have any, so Sampson had P.T. write a shopping list, and P.T. wrote licorice, Jolly Ranchers, candy, chips, and cookies on a white piece of paper that had wet spots on it. (*Id.* at 70-71.) At trial, P.T. identified his handwriting on the list that police later found in Sampson's home. (ECF Nos. 35-1 at 70-71, 36-1 at 36.) In that room, Sampson tied P.T.'s legs, arms, and neck to a recliner with yellow rope, and left for the store. (ECF No. 35-1 at 75, 78-79.) At trial, P.T. identified photographs of the chair, yellow noose and ropes, and bathrobe, that police later discovered in Sampson's house. (*Id.* at 81-82, 140, 182; 36-1 at 35, 57.) When P.T. believed Sampson was gone, he untied himself, found his jacket, donned clothes that did not belong to him that he found in Sampson's house, and ran home. (*Id.* at 79-80.) P.T. identified a photograph of the green sweatpants and blue boxers he originally wore to Sampson's house that police later found on a bed in Sampson's house. (ECF Nos. 35-1 at 80-84, 36-1 at 36.)

At home, P.T.'s mother, Veronica Michelle Johnson, saw P.T. had been crying and his face was pale. (ECF No. 35-1 at 34.) She asked, "What's wrong with you," and he

3

"kept saying that some man picked him up at the bus stop and took him to his house and just did all kind of wrong things to him," and she told him, "Quit lying," but P.T. insisted he was not lying. (*Id.*) P.T. wore his coat, but she did not recognize the shoes, pants, and t-shirt he wore. (*Id.* at 35-36.) She asked how he got out of the man's house, and he told her he was tied up but got loose and ran home. (*Id.*) Johnson described P.T. as an "erratic mess," and, after telling her neighbor about it, P.T. took them to Sampson's house and Johnson called the police. (*Id.* at 34-35, 45-46, 86-87.)

**B.      Investigation**

Las Vegas Metropolitan Police Department (Metro) detective Jason Nelson responded and spoke with P.T. outside Sampson's residence. (*Id.* at 120-29, 144.) Without saying anything about sexual abuse P.T. told Nelson he was taken to McDonalds in a blue Ford Crown Victoria with cloth interior, a black revolver was used, P.T. was tied up in a white or beige recliner with yellow ropes, and he escaped. (*Id.*) He told Nelson he was asked to write a shopping list and wrote Jolly Ranchers, Fruit Rollups, chips, and cookies, on yellow paper with blue lines that had a water stain on it. (*Id.*) He told Nelson that he told Sampson he liked rap music and Sampson tuned the radio to that genre. (*Id.*)

While P.T. was speaking with Nelson, P.T. pointed to Sampson's vehicle, which was just pulling into the driveway at Sampson's home, and said, "Well, there's the guy right there." (*Id.* at 131.) Sampson exited his car, walked down the driveway to the street, and looked at P.T. and the officers. (*Id.* at 132-33.) Metro Sergeant Dennis Burgess and Officer Mike Seed confronted Sampson. (*Id.*) Burgess pointed to P.T., and asked Sampson whether he knew him, but Sampson denied it. (ECF No. 36-1 at 17.) Sampson consented to a search of his vehicle, which contained cookies, candies, and Jolly Ranchers but, contrary to Sampson's testimony, no sandwich steaks, cereal, vegetables, bread, or macaroni salad. (ECF Nos. 35-1 at 133-34; 36-1 at 18-20, 156, 195-96.)

During a second conversation, P.T. told Nelson that Sampson blindfolded him with something white, touched his penis, attempted to have P.T. perform fellatio, bathed him,

rubbed him with lotion, and gave P.T. a white robe, white-t-shirt, and red silk boxers. (ECF No. 35-1 at 134-35, 138-39.) Sampson told Nelson and Burgess it was possible P.T.'s clothes were inside Sampson's house as P.T. was performing yard work; however, Sampson refused to allow police to retrieve P.T.'s clothes. (*Id.* at 158-59.)

Pediatric emergency room physician Teresa Vergara examined P.T., and prepared a sexual assault kit, but found no ejaculate semen or sperm. (ECF No. 36-1 at 27-28, 62, 68-71, 77-80.) Metro forensic scientist David Welch found no foreign DNA on P.T.'s sexual assault kit swabs, Sampson's penal swab, or on green sweatpants, blue boxer shorts, a white t-shirt, brown boxer shorts, towels, a washcloth, bedding, pillowcases, or sheets from Sampson's house; but found Sampson's semen and sperm on a white handkerchief. (*Id.* at 80-82, 90-100.)

When police searched Sampson's residence, they heard music and found a white folded handkerchief, P.T.'s green sweatpants and blue boxers, lotion, McDonald's wrappers, a McDonald's cup, a water-stained shopping list for Jolly Ranchers, Fruit Rollups, candy, chips, cookies, and candy, a white or beige recliner with yellow ropes on it, and a white bathrobe. (ECF Nos. 35-1 at 129-30, 136-40; 36-1 at 35-36, 57-58.) Police also found a revolver inside a shoe rack behind a bedroom door. (ECF No. 35-1 at 142.)

Metro latent print examiner Joel Geller concluded P.T.'s fingerprints were found in Sampson's vehicle. (*Id.* at 195-96, 201-02.) Sampson's palm print and P.T.'s fingerprint were found on a steno notepad. (*Id.* at 204-06.) The revolver and six cartridges in Sampson's residence were negative for full or partial fingerprints. (*Id.* at 202, 207.)

**C.    Sampson's Testimony.**

Sampson denied tying up P.T., attempting to have sex with him, putting P.T.'s penis in his mouth, attempting to put his penis in P.T.'s mouth, putting lotion on P.T., or touching P.T. in a sexual way. (ECF No. 36-1 at 154-55, 167-68.)

Sampson was driving home when he saw P.T. at a bus stop waving his hands. (*Id.* at 130-31.) Sampson was not sure whether he knew him, so he turned around and rolled

5

the window down. (*Id.* at 131-32.) P.T. approached the car and apologized that he mistook Sampson for someone else and asked for a ride to McDonald's because he hadn't eaten all day. (*Id.*) P.T. was pleading and wore a black cap and filthy brown coat without a shirt. (*Id.* at 132-33.) Sampson agreed to take P.T. to McDonald's. (*Id.*) Sampson told P.T. it was his lucky day, and he would buy P.T. whatever he wanted to eat. (*Id.* at 134-35.) Sampson paid for the food with a $20 bill and received $12 plus change. (*Id.*) He gave P.T. $2 and change and told P.T. he was getting his food to-go because he had to clean his house. (*Id.* at 136.) It was Sampson's intention to leave P.T. at the McDonalds, but P.T. asked to go to Sampson's house where they ate the food at his kitchen table. (*Id.* at 136, 139-40, 175-77.) Sampson denied ever pointing a firearm at P.T. (*Id.* at 141.)

P.T. gave a different name than P.T., and it was Sampson's understanding P.T. ran away from home for a couple of days. (*Id.* at 141-42.) Sampson told P.T. he did that once, it was a bad experience and encouraged P.T. to call somebody. (*Id.*) P.T. became irritable and went to watch TV, while Sampson cleaned the kitchen. (*Id.*) P.T. exhibited a ripe odor, and his coat was dingy and dirty, as if P.T. had not taken a bath in four or five days, so Sampson asked him, "why don't you take a bath while you're here." (*Id.* at 146.) P.T. never took a bath and Sampson never got into the bathtub with P.T. (*Id.* at 147.)

Sampson retrieved a change of clothes for P.T. from his spare room and intended to wash P.T.'s clothes at a neighbor's house, but the neighbor had company that day. (*Id.* at 147-50.) P.T. asked Sampson about a chair in the spare room that had ropes on it. (*Id.*) Sampson explained at trial that he and a female friend used that chair for sex. (*Id.*) When P.T. touched the ropes, Sampson told him to leave them alone, gave him shorts and a t-shirt, and left the room. (*Id.*) Sampson claimed he fried a chicken and cleaned the kitchen; however, police testified they did not see or smell fried chicken when they searched Sampson's residence later that day. (ECF Nos. 35-1 at 144-46; 36-1 at 144, 151-54, 180-81.) Sampson told P.T. to write down what he wanted from the store. (ECF No. 36-1 at 151-54.) P.T. told Sampson he would take a bath while Sampson was at the store. (*Id.* at

155.) Sampson went to Von's grocery store and claimed he bought three grocery bags of food, including vegetables, cereal, milk, juices, sandwich steaks, bread, and macaroni salad, and items on P.T.'s list. (*Id.* at 156, 195-96.)

When Sampson returned home, he saw four police cars nearby. (*Id.* at 156-58.) He told Officer Burrell he knew P.T., brought him to his house, and P.T. thought he was supposed to be working at Sampson's house. (*Id.* at 158-59.) Sampson told police they could not go into his house but consented to a search of his vehicle. (*Id.* at 159-60.) Sampson said his firearm was in a shoe rack inside its holster behind a door and denied taking it out of the holster while P.T. was in his house. (*Id.* at 160-62.)

### D.     Procedural Summary

#### 1.     First Trial and Related Proceedings[4]

In 2003, Sampson was charged with: (1) First-Degree Kidnapping With Use of a Deadly Weapon; (2) Lewdness With a Child Under the Age of Fourteen Years with Use of a Deadly Weapon; (3) Lewdness With a Child Under the Age of Fourteen Years with Use of a Deadly Weapon; (4) Attempted Sexual Assault With a Minor Under Fourteen Years of Age With Use of a Deadly Weapon; (5) Sexual Assault with a Minor Under Fourteen Years of Age With Use of a Deadly Weapon; and (6) Possession of a Firearm by an Ex-Felon. (ECF No. 7-2 at 16-18.)

By prearrangement,[5] the State bifurcated for purposes of jury trial the charge of Possession of a Firearm by an Ex-Felon. (*Id.* at 7-9.) A jury convicted Sampson for the remaining five charges but acquitted him of committing those offenses "with use of a deadly weapon," i.e., a firearm.[6] Following the jury verdict, Sampson pleaded guilty to Possession of a Firearm by an Ex-Felon under a Guilty Plea Agreement ("GPA"). (ECF

---

[4]It appears Respondents did not file all relevant exhibits from the first trial and related proceedings. The Court takes judicial notice of the exhibits for the first trial and related proceedings filed in Case No. 3:11-cv-19-LRH-WGC.

[5]Case No. 3:11-cv-00019-LRH-WGC (ECF Nos. 11-17 at 9-10, 11-21 at 6-7).

[6]Case No. 3:11-cv-00019-LRH-WGC (ECF No. 12-12).

Nos. 31-2, 31-3 at 7.) Sampson was sentenced to 21 years to life imprisonment. (ECF Nos. 31-5 at 11-12, 31-6.)

Sampson unsuccessfully pursued appeal and state postconviction relief.[7] (ECF No. 31-6.) Sampson was initially denied relief in federal habeas proceedings.[8] In 2015, the Ninth Circuit Court of Appeals entered an unpublished memorandum opinion reversing with instructions to grant a conditional writ of habeas corpus.[9] (ECF No. 31-7.) The federal district court granted a conditional writ of habeas corpus, and the State filed a notice of election to retry Sampson.[10]

### 2.    Second Trial and Related Proceedings

On remand in state court, the State filed a Fourth Amended Information alleging the same five crimes for which the jury convicted Sampson during the first trial but omitted all firearm-enhancement allegations because the jury for the first trial found Sampson not-guilty of using a firearm during all the offenses. (ECF Nos. 33-4, 33-5 at 9-10.) The second jury convicted Sampson for the five offenses; only this time, Sampson was sentenced to 30 years to life imprisonment. (ECF No. 37-9.) The convictions were affirmed on direct appeal and in *pro se* state postconviction review proceedings. (ECF Nos. 39-4, 40-10.)

## III.   LEGAL STANDARD

### A.    Review under the Antiterrorism and Effective Death Penalty Act

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with

---

[7]Case No. 3:11-cv-00019-LRH-WGC (ECF Nos. 14-6, 46-3).

[8]Case No. 3:11-cv-00019-LRH-WGC (ECF No. 86).

[9]Case No. 3:11-cv-00019-LRH-WGC (ECF No. 97).

[10]Case No. 3:11-cv-00019-LRH-WGC (ECF Nos. 105, 107).

respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is contrary to established Supreme Court precedent, within the meaning of Section 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of established Supreme Court precedent under Section 2254(d)(1) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (internal citation omitted) (quoting *Williams*, 529 U.S. at 409-10).

The Supreme Court has instructed that a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations

9

omitted) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt"). To obtain habeas relief, a prisoner must show that the state court's ruling on the claim presented was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

### B.    Standards for Evaluating Ineffective Assistance of Counsel ("IAC")

An IAC claim requires a petitioner demonstrate (1) the attorney's "representation fell below an objective standard of reasonableness[;]" and (2) the attorney's deficient performance prejudiced the petitioner such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984). "Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.*

A petitioner who makes an IAC claim "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. A court considering an IAC claim, "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689. Thus, when considering IAC claims, a court is obliged to "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690. "In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case," and "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

10

"A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. Strategic choices made "after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Id.* at 690. However, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91.

In establishing there is a reasonable probability the result of the trial would have been different, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112; *Cullen*, 563 U.S. at 189. A petitioner must show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The burden is on the petitioner to overcome the presumption that counsel made sound trial-strategy decisions. *See Harrington*, 562 U.S. at 104.

The Supreme Court has clarified that *Strickland* and Section 2254(d) are each highly deferential, and when the two apply in tandem, review is doubly so. *See id.* at 105. "[W]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

### C.   Standards for Evaluating Procedurally Defaulted IAC Claims

"A federal habeas court generally may consider a state prisoner's federal claim only if he has first presented that claim to the state court in accordance with state procedures." *Shinn v. Ramirez*, 596 U.S. 366, 371 (2022). Where a petitioner fails to do so and therefore "has defaulted his federal claims in state court pursuant to an

11

independent and adequate state procedural rule," federal habeas review "is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Id.* (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).

For IAC claims, a petitioner may establish cause, thereby excusing procedural default where (1) the claim of ineffective assistance of trial counsel [is] a "substantial" claim; (2) the "cause" consist[s] of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law requires that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding." *Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (quoting *Martinez v. Ryan*, 566 U.S. 1, 14, 18 (2012)).[11]

In *Martinez*, the Supreme Court stated the standard for issuing a Certificate of Appealability (COA) as analogous support for whether a claim is substantial. *See Martinez*, 566 U.S. at 14. According to the COA standard, a claim is substantial if a petitioner shows "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). An ineffective-assistance-of-trial-counsel claim "is insubstantial" if it lacks merit or is "wholly without factual support." *Martinez*, 566 U.S. at 14-16 (citing *Miller-El*, 537 U.S. 322).

"[T]he standard for evaluating the underlying trial counsel IAC claim during the *Martinez* prejudice analysis is not as stringent as that required when considering the merits of the underlying [*Strickland*] claim." *Leeds v. Russell*, 75 F.4th 1009, 1017 (9th

---

[11]Nevada prisoners must raise IAC claims involving trial counsel in an initial state postconviction petition, which is the initial collateral review proceeding for purposes of applying *Martinez*. *See Rodney v. Filson*, 916 F.3d 1254, 1259-60 (9th Cir. 2019).

Cir. 2023) (citing *Michaels v. Davis*, 51 F.4th 904, 930 (9th Cir. 2022) ("[A] conclusion on the merits of [a trial counsel IAC] claim under *Strickland* holds a petitioner to a higher burden than required in the *Martinez* procedural default context, which only requires a showing that the [trial counsel IAC] claim is 'substantial.'")). Review of trial counsel's actions in a *Martinez* prejudice analysis is conducted "under a more relaxed standard", while the *Strickland* standard is applied "with full force" when considering actions of postconviction review counsel under a *Martinez* analysis. *Leeds*, 75 F.4th at 1022. Although the requirements are distinct, "[t]he analysis of whether both cause and prejudice are established under *Martinez* will necessarily overlap, 'since each considers the strength and validity of the underlying ineffective assistance claim.'" *Ramirez v. Ryan*, 937 F.3d 1230, 1241 (9th Cir. 2019), *reversed on other grounds by Shinn*, 596 U.S. 366. If a petitioner can show cause and prejudice to excuse a procedural default, a federal court may consider the claim *de novo*. *See Dickens v. Ryan*, 740 F.3d at 1302, 1321 (9th Cir. 2014) (citing *Pirtle v. Morgan*, 313 F.3d 1160 (9th Cir. 2002)).

## IV.    DISCUSSION[12]

The Court previously determined Sampson's IAC claims in Grounds 1-4 and 6-8 are technically exhausted by procedural default. (ECF No. 96 at 12.) The Court will consider whether Sampson can demonstrate cause and prejudice to overcome the

---

[12]Sampson asserts the standard of review proscribed by 28 U.S.C. § 2254(d) violates the U.S. Constitution, specifically the Suspension Clause (Article One, Section Nine, clause two); fundamental principles of separation of powers (Articles One, Two, Three); the ban on cruel and unusual punishments (Amendments Eight and Fourteen); and the guarantee of due process (Amendments Five and Fourteen). (ECF No. 88 at 9.) Respondents did not address these allegations in their Answer to the Petition. (ECF No. 99.) Sampson concedes in his Petition that the Ninth Circuit Court of Appeals has rejected arguments that AEDPA violates the Suspension Clause and separation of powers doctrine. (*Id.* (citing *Crater v. Galaza*, 491 F.3d 1119 (9th Cir. 2007)). Rule 2(c) of the Rules Governing Section 2254 Cases requires a federal habeas petition specify all grounds for relief and "the facts supporting each ground." Conclusory allegations unsupported by specific facts may be summarily dismissed. *See Mayle v. Felix*, 545 U.S. 644, 649, 655-56 (2005); *Blackledge v. Allison*, 431 U.S. 63, 74 (1977). Sampson failed to specify facts or law in the Petition to support these allegations. The Court thus dismisses these allegations with prejudice as conclusory and without merit and denies a COA.

13

defaults under *Martinez*. The parties agree Sampson was unrepresented during his initial state post-conviction proceedings and need only establish prejudice under *Martinez* to overcome the defaults. (ECF Nos. 99 at 14, 102 at 20.)

### A. Ground 1—IAC—Admission of Sampson's Prior Testimony

Sampson alleges trial counsel provided ineffective assistance in violation of the Sixth Amendment by failing to object to the admission of Sampson's prior testimony given during his first trial. (ECF No. 88 at 10-13.) He claims counsel should have objected his testimony was inadmissible hearsay, and alternatively, did not constitute admissible impeachment evidence because it was presented during the State's case-in-chief. (*Id.*) He claims he was prejudiced because the jury was deprived of deciding his credibility. (*Id.*) Respondents argue this claim must be dismissed as procedurally defaulted or alternatively denied on the merits as the testimony was admissible as former testimony. (ECF No. 99 at 16-19.)

### 1. Additional Background

At the first trial, Sampson's trial counsel advised him that, under Nevada law, if he waived his Fifth Amendment rights and testified, he could not later invoke them in a subsequent trial.[13] At the second trial, the State announced its intention to read to the jury during its case in chief Sampson's prior testimony from the first trial, except for redactions concerning prior bad acts. (ECF No. 34-2 at 65-66.) Defense counsel objected based on the Fifth Amendment right against self-incrimination, but the trial court ruled Sampson's prior testimony admissible as Sampson had waived the privilege at the first trial:

> [DEFENSE COUNSEL]: [M]y position is that, you know, we're going back to square one. Oh, and we're going back to square one and because we're going back to square one, Mr. Sampson has the right against self-incrimination.
>
> So I don't think the State should be allowed to read in—as [the prosecutor] says, technically yes, it wasn't because of anything that Mr. Sampson said that this case was reversed. It was reversed because the court wouldn't let the defense go into oppositional defiance disorder.

---

[13]Case No. 3:11-cv-00019-LRH-WGC (ECF No. 12-4 at 29).

However, since the court would not allow the defense to get into ODD, there was nothing per se to contradict P.T.'s testimony, and based on that Mr. Sampson may have felt compelled to testify in that case. However, in this case we are able to get into that on the basis of reversal. So I believe that this is a do-over, that Mr. Sampson should be afforded his right against self-incrimination, the State should not be allowed to do that.

THE COURT: He gave it up. He waived his Fifth Amendment right. You believe that on a retrial that he somehow regains it?

[DEFENSE COUNSEL]: Yes.

THE COURT: If you can show me any legal authority where a court has said that—because I know of none, that says you can waive it and then somehow get it back if your trial is reversed.

[THE STATE]: And your Honor, pursuant to *Byford*, as well as *Turner v. State*, *Byford* is kind of the most recent decision, that's 116 Nev. 215, it expressly deals with this case. And I'll just read from just straight out of the decision.

. . . .

[THE STATE]: *Byford*. And *Turner v. State*, 98 Nev. 103. I'm just going to read just this excerpt, because it directly deals with this very challenge.

"Byford contends the use of his prior testimony constituting [sic] improper comment on his decision not to testify at the second trial. Byford does not cite any authority or refer to any facts to support this contention. Generally a defendant's testimony at a former trial is admissible against him in later proceedings, citing *Harrison*, 392 U.S. 222, quote, if otherwise admissible, a defendant's prior testimony may be introduced at a second trial as part of the State's case in chief."

And that's they're quoting now the *Turner v. State* decision. "Moreover in this case, the State didn't introduce the prior testimony of Williams, Byford's co-defendant, did. Our review of the record indicates [unintelligible] never referred to the prior testimony as a way of commenting on Byford's silence at the second trial."

So the bottom line is it's pretty clear the general rule is once you've got up and taken the stand under oath, you've waived it. And there's an issue if the basis of the reversal has something to do with his testimony at trial, but that's not what we have here. It's solely about the psychiatrist not being allowed to testify about ODD.

And therefore, we'll go through the appropriate redactions, remove bad acts or objections that were sustained. But as far as the sum and substance of what he's saying, it's admissible under Nevada law.

THE COURT: Okay. I believe it's admissible. Unless you—I mean, that's like saying you made a confession, went to trial, the confession was read, but then somehow if that trial's reversed you get that—you get to throw that confession out? I mean, it doesn't make sense. When you waive your right to remain silent, you waive it. I don't believe—and he clearly fully waived it because he got up on the stand and he testified. I don't think he gets it back.

(*Id.* at 67-69.) Sampson's prior testimony was read during the State's case in chief. (ECF No. 36-1 at 124-25.)

Sampson did not testify in person at the second trial because the court ruled the State could impeach him with the conviction for Possession of a Firearm by an Ex-Felon, to which he pleaded guilty during the bifurcated proceeding following the first trial. (ECF No. 35-1 at 214.) When the trial court canvassed Sampson about his right to testify in-person at the second trial, defense counsel explained he advised Sampson not to testify because the court allowed impeachment with Sampson's firearm conviction. (*Id.* at 216-22.) Sampson confirmed he did not testify on the advice of counsel. (ECF No. 37-2 at 10.)

### 2.      Standards for Evaluating Admission of Prior Testimony

Generally, a defendant's testimony at a former trial is admissible in evidence against him in later proceedings. *See Harrison v. United States*, 392 U.S. 219, 222 (1968); *United States v. Baker*, 850 F.2d 1365, 1370 (9th Cir. 1988) (recognizing "[t]he general rule is 'that a defendant's testimony at a former trial is admissible against him in a later proceeding.'"); *Byford v. State*, 994 P.2d 700, 707 (Nev. 2000) ("Generally, a defendant's testimony at a former trial is admissible against him in later proceedings. . . "[I]f otherwise admissible, a defendant's prior testimony may be introduced at a second trial as part of the state's case-in-chief.") (citing *Harrison*, 392 U.S. at 222); *see also United States v. Fabricant*, 506 F. App'x 636, 640 (9th Cir. 2013) (holding prior testimony admissible in subsequent retrial where testimony was given to present an independent narrative of events and challenge the State's factual claims and where the motivation to testify was unrelated to the error that resulted in a new trial).

Under NRS § 51.325, former testimony is admissible hearsay under certain conditions:

> Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of another proceeding, is not inadmissible under the hearsay rule if:
> 1. The declarant is unavailable as a witness; and

16

2. If the proceeding was different, the party against whom the former testimony is offered was a party or is in privity with one of the former parties and the issues are substantially the same.[14]

The State can use a witness's prior testimony if the witness is unavailable, and the defendant was represented by counsel at the prior proceeding. *See* NRS § 171.198(7)(b). A criminal defendant is an unavailable witness because the prosecution cannot call such a defendant as a witness. *See* NRS § 50.115(4); *see also* NRS § 51.055(1)(a) (stating a declarant is "unavailable as a witness" if the declarant is "[e]xempted by ruling of the judge on the ground of privilege from testifying concerning the subject matter of the declarant's statement[.]").

The Nevada Supreme Court ("NSC") held that a defendant who invokes the Fifth Amendment privilege against self-incrimination is unavailable, and, thus, his testimony at a preliminary hearing during which he was represented by counsel and cross-examined was admissible hearsay. *See Funches v. State*, 944 P.2d 775, 778-79 (1997) (expanding the list of conditions in NRS § 171.198 for unavailability to include NRS § 51.055 and other general provisions of the evidence code when determining a witness's unavailability). In *Funches*, during a joint trial of the defendant and codefendant, the State was permitted to read into evidence the codefendant's preliminary hearing testimony. *See id.* at 776. Although the codefendant was not unavailable within the meaning of NRS § 171.198(6)(b), he was unavailable to testify due to NRS § 50.115(4) because as a defendant, the prosecution could not call him as a witness. *See id.* at 779. Because the codefendant was unavailable under NRS § 50.115(4), the district court correctly admitted the prior testimony. *See id.*

---

[14]As relevant here, "'[h]earsay' means a statement offered in evidence to prove the truth of the matter asserted unless: . . . [t]he statement is offered against a party and is: (a) [t]he party's own statement, in either the party's individual or representative capacity; or "[a] statement of which the party has manifested adoption or belief in its truth[.]" NRS § 51.035(3)(a) & (b).

17

The NSC has additionally explained that it is proper under the hearsay rule to admit an exculpatory statement during the State's case-in-chief as an admission if it tends to establish guilt. *See Turner v. State,* 641 P.2d 1062, 1064 (1982) (citing *Geer v. State*, 548 P.2d 946 (Nev. 1976) (explaining that a statement purportedly exculpatory in nature may nevertheless qualify as an admission, if it tends to establish guilt)). In *Turner*, the defendant argued his prior testimony was inadmissible as an admission or prior inconsistent exculpatory statement. *See id.* The NSC determined defendant's exculpatory testimony was admissible as it placed him at the scene, established an altercation occurred, that he inflicted harm to the victim, and those facts tended to establish guilt. *See id.*

### 3.      Analysis of Ground 1

Sampson has not established a substantial claim that trial counsel's failure to object to the admission of Sampson's prior trial testimony as hearsay constitutes deficient or prejudicial performance under *Strickland*. *See Martinez*, 566 U.S. at 14-16. Sampson contends his prior testimony was inadmissible hearsay because it did not constitute an admission of guilt; rather, it was exculpatory because he maintained his innocence.

Given the NSC's decisions in *Funches* and *Turner*, objection was futile because Sampson waived his privilege during the first trial, he was unavailable for the second trial, and his prior testimony was admissible in the State's case in chief because it included statements tending to establish guilt. *See Turner,* 641 P.2d at 1064.

Sampson's prior testimony contributed to a finding of guilt as it placed him, an aging adult, and P.T., a 12-year old child, who were complete strangers, at the scene of the offenses, i.e., Sampson meeting at a bus stop, driving P.T. to McDonald's and purchasing whatever P.T. wanted to eat, driving P.T. to Sampson's home, suggesting P.T. bathe, P.T.'s handling the ropes on the chair, giving P.T. a change of clothes, playing P.T.'s music genre, telling P.T. to write a list of items he wished from the store, and conversation about P.T. doing yard work for money. *See Turner*, 641 P.2d at 1064. The

State's expert testified that some of those activities admitted by Sampson could be construed as "grooming" strategies to prime P.T. for sexual abuse, for refraining from reporting sexual abuse, and for later acquiescence to sexual abuse. In closing, the State argued Sampson claimed he was going to pay P.T. to perform yard work but there was no evidence of that, and Sampson claimed he was going to wash P.T.'s clothes, but that was not done either. (ECF No. 37-4 at 18-19.) In addition, Sampson's credibility was undermined because his testimony was contradicted by other testimony. He testified he fried chicken before heading to the store, but police found no evidence of fried chicken in Sampson's house only a few hours later. He claimed that, in addition to snacks on P.T.'s shopping list, he purchased food at the market before returning home; but police stopped Sampson before he could take his groceries inside the house, searched the car, and did not find many of the items Sampson claimed he bought. Sampson denied sexual activity with P.T., but P.T. claimed he was blindfolded with something white, and police found Sampsons' semen and sperm on a white handkerchief inside Sampson's house. Sampson told Officer Seed he did not know P.T., but when Seed asked if they would find P.T.'s clothes in his house, Sampson claimed they might be inside because P.T. was doing yard work and didn't want to get his clothes dirty. Thus, Sampson's prior testimony was inculpatory and admissible during the State's case in chief. *See Turner*, 641 P.2d at 1064.

Assuming Sampson established a substantial claim that trial counsel was deficient for failing to object that Sampson's prior testimony was inadmissible hearsay, Sampson has not established a substantial claim that there is a reasonable probability the result of the proceeding would have been different had counsel done so. Sampson speculates that, had his prior testimony been excluded, he would have testified, and his in-person testimony would have changed the outcome. But, given that Sampson provides no basis to conclude his testimony would have been materially exculpatory the second time, his

speculation falls short of the requirement of a substantial, not merely conceivable, likelihood of a different result. *See Harrington*, 562 U.S. at 112.

All fairminded jurists would agree Ground 1 fails to allege a substantial IAC claim because the claim lacks merit or is wholly without factual support. *See Martinez*, 566 U.S. at 14-16. Consequently, Sampson has not established cause to overcome the default and Ground 1 is dismissed as technically exhausted by procedural default.

### B.   Ground 2—IAC—Admission of Prior Testimony by Police

Sampson alleges trial counsel provided ineffective assistance in violation of the Sixth Amendment by failing to adequately object to admission of prior testimony of Officers Kisner and Seed given in the first trial. (ECF No. 88 at 13-17.) He alleges trial counsel failed to argue the State did not make a good faith effort to secure the officers' attendance at the second trial as the officers were on vacation; not unavailable. (*Id.*) He alleges prejudice because the jury was unable to judge the officers' credibility based on live testimony. (*Id.*) Respondents argue this claim should be dismissed as procedurally defaulted or denied as meritless because Sampson chose to proceed with trial rather than seek a continuance to permit the officers to testify in-person. (ECF 99 at 19-23.) They argue Sampson fails to establish trial counsel's performance was not a reasonable strategy or identify what testimony he could elicit that is different from the first trial. (*Id.*)

### 1.   Additional Background

The Federal District Court in Nevada ordered the State to retry Sampson or release him by August 8, 2017. (ECF No. 32-2 at 3.) The State could, however, request a reasonable extension of that deadline. (*Id.*) Trial was scheduled for August 1, 2017. (ECF No. 33-3 at 7.) The State served trial subpoenas on Kisner and Seed. (*Id.* at 11.) Kisner responded with a Uniform Non-Appearance Notification and Seed likewise informed the State, that they would be out of the jurisdiction for the trial dates. (*Id.*)

The State moved to admit the transcripts of Kisner and Seed's testimony from the first trial. (*Id.* at 2.) Defense counsel opposed the motion:

[DEFENSE COUNSEL]: So they're both employed by Metro. And they are, apparently on vacation. I don't know where.

According to [the State], they're not going to be available this week. They're not going to be available next week. They're not going to be available the week after that. However, they would be available, if the trial goes that next week, which we all hope would not happen.

However, because they're Metro's employees and because Metro certainly has the wherewithal to fly them back from wherever they are—now, I don't know—I think that the Court should order that they be allowed to testify—that they should testify in person. If not, then their testimony shouldn't be used or they can have somebody else testify in their behalf. Or I mean, regarding the—the situations that they could testify and have testified about.

[THE STATE]: And Your Honor, the State's obviously going to object to that. The bottom line is this, these two men who work for Metro have taken a—an over a week long summer vacation. Joel Kisner is also retired from Metro. I think he's now—he retired maybe last week.

THE COURT: So he doesn't work for Metro anymore?

[THE STATE]: But he's on—currently he doesn't work for Metro anymore. But this nonappearance indicates that he's unavailable and out of state until August 8, 2017.

Sergeant Seed is also out of state and unavailable until August 8, 2017.

The idea that Metro will be ordered to bring them back from vacations so they can testify live doesn't make a whole lot of sense. Because here's one of the issues, the defendant is the one who holds all the cards right here. The only person right now who could ask for continuance, if they really need Joel Kisner and Michael Seed to testify live, it's him. He's the one who has the ability to file a continuance with the Federal District Court saying I need more time because I want Michael Seed and Joel Kisner here. But he's not doing that. He is demanding that this trial go forth at this point in time.

Given that fact, we have all—we are all working under the auspices that he wants to go to trial now. And so accordingly, Metro shouldn't be ordered to bring them back from their vacations and have that cut short. These individuals have already testified. He and his lawyers have already cross-examined them.

The remedy is not to order them back. The remedy is to allow these transcripts to go forward and be read into the record, because his right to confrontation has been satisfied.

And the basis for the reversal in this case has nothing to do with the testimony of Sergeant Seed or Detective Kisner.

So at this point, I don't think there's a proper basis. If he wants to go forward with trial, then at this point these two transcripts should be admitted.

. . . .

[DEFENSE COUNSEL]: And you know, based on that, I—I don't think—now, a legitimate remedy would be to continue this trial. He wants to go to trial. State's prepared. I'm prepared. I—I don't think that's the remedy.

21

On that, I'll submit it.

THE COURT: Okay. At this time, the Court's going to grant the motion and the State can prepare the orders.

(ECF No. 33-5 at 5-9.)

Seed's prior testimony was read to the jury. (ECF No. 35-1 at 153-67.) Seed testified, among other things, that Sampson denied knowing P.T. when he approached Sampson on the day of the incident. (*Id.*) Sampson told Seed it was possible P.T.'s clothes were inside his house as P.T. was performing yard work, he did not want P.T. to get his clothes dirty, and P.T. changed clothes. (*Id.*) But, when police asked Sampson if they could retrieve the clothes, Sampson refused and "seemed rather nervous." (*Id.*) Kisner's prior testimony was read to the jury. (*Id.* at 167-93.) Among other things, he testified he executed a search warrant at Sampson's home where he found a pistol, boy's boxer shorts, yellow rope, and a notepad bearing a handwritten shopping list. (*Id.*) He found no cookies or candy inside the house; but found some inside Sampson's car. (*Id.*)

### 2.    Standards for Evaluating Witness Unavailability

The Confrontation Clause bars the admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination. *See Crawford v. Washington*, 541 U.S. 36, 53-54 (2004); s*ee also Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (stating "[g]enerally speaking, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."). A witness is not "unavailable" for purposes of the confrontation requirement unless the prosecutorial authorities made a good-faith effort to obtain his presence at trial. *See Barber v. Page*, 390 U.S. 719, 724-25 (1968). "[I]f no possibility of procuring the witness exists (as, for example, the witness'[s] intervening death), 'good faith' demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith may demand their effectuation." *Ohio v. Roberts*, 448 U.S. 56, 74 (1980), *overruled*

*on other grounds by Crawford*, 541 U.S. 36. "The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness." *Id.* "The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness." *Id.* In Nevada, a transcript of a witness's preliminary hearing testimony may be admitted into evidence at a criminal trial on three conditions: (1) if defendant was represented by counsel at preliminary hearing; (2) counsel was provided with adequate opportunity to cross-examine witness at preliminary hearing; and (3) the witness is unavailable at time of trial. *See* NRS § 171.198(7)(b); *Power v. State*, 724 P.2d 211, 212 (Nev. 1986).

### 3.    Analysis of Ground 2

Sampson fails to establish a substantial claim that trial counsel failed to adequately argue the State did not make a good faith effort to secure the attendance of the officers at the second trial. Trial counsel objected to the State's motion to admit the officers' prior testimony arguing vacation was no excuse and the State could transport them for trial. The trial court nonetheless granted the State's motion. Counsel's objection was futile. Sampson provides no authority that required the trial court to deny the State's motion for admission of the testimony. The State could have requested a continuance of the deadline to retry Sampson, but Sampson's counsel opposed trial continuance as a remedy. Ground 2 is insubstantial because it lacks merit or is wholly without factual support and is dismissed with prejudice as technically exhausted by procedural default.[15] *See Martinez*, 566 U.S. at 14-16.

---

[15]Sampson erroneously relies on *Earhart v. Konteh*, 589 F.3d 337, 345 (6th Cir. 2009). In *Earhart*, a victim of alleged sexual abuse was on vacation and her deposition testimony was admitted at trial. *See* 589 F.3d at 342. The State did not seek to compel her presence at trial by compulsory process even though it knew her location. *See id.* at 345. The Sixth Circuit Court of Appeals held that the State's "complete lack of effort to secure her presence," was insufficient to establish a "good-faith effort" to obtain the victim's presence at trial. *Id.* The *Earhart* court concluded admission of the deposition testimony violated the Confrontation Clause under clearly established federal law as there was no proper finding the witness was constitutionally unavailable. *See id.* In Sampson's case, the State made a good faith effort by subpoenaing the officers to secure their

### C.    Ground 3—IAC—Failure to Object to Expert Testimony

Sampson alleges trial counsel provided ineffective assistance in violation of the Sixth Amendment by failing to object and move to disqualify or strike the testimony of the State's expert John Pacult or present a defense expert to refute Pacult's testimony. (ECF No. 88 at 17-21.) He claims Pacult's testimony about grooming strategies lacked methodological rigor necessary for expert testimony, and as lay testimony, did not meet the requirement for expert testimony under state law. (*Id.*) He alleges he was prejudiced because Pacult testified as an expert to generalizations and lay opinions, expert testimony carries great weight, and it added credibility to P.T.'s uncorroborated testimony. (*Id.*) Respondents contend, among other things, Pacult's testimony qualified as expert testimony and counsel cannot be faulted for failing to make a futile objection. (ECF No. 99 at 22-24.)

#### 1.    Additional Background

The State filed a notice that Pacult would testify as an expert at trial regarding grooming techniques used by perpetrators of sexual abuse upon minors and/or clinical and expert observations about the impact of sexual abuse on a minor, and anticipated responses and reactions of a minor who is sexually abused, including difficulties and issues surrounding the disclosure of sexual abuse. (ECF No. 32-9 at 3.)

Clinical social worker John Sebastian Pacult testified he is a masters-level social worker specializing in adult and juvenile sex offenders and conducted between 5,000 and 6,000 risk assessments on sex offenders over the prior 19 years. (ECF No. 36-1 at 104-05.) He is neither a medical doctor, psychiatrist, nor psychologist. (*Id.* at 114-15.)

Pacult testified "grooming" is "the preparation of a child or potentially an adult for sexual contact." (*Id.* at 107.) He explained "[t]he grooming process is conducted to develop a relationship with that child in the hopes of having physical sexual contact with

---

attendance at trial and the officers were subjected to cross-examination by Sampson's counsel at the first trial.

24

that child" and "trying to reduce the likelihood that the child would report the behavior," and "make the child feel responsible for the behavior that's happening" to "reduce the likelihood of reporting." (*Id.*) He explained this can be accomplished through "gift giving, physical contact, preys [sic], things of that nature, exposing a child to sexually explicit discussions, material, things along those lines." (*Id.*) He explained there can be "nice grooming" i.e., trying to develop a bond through attention, affection, gifts, praise, reward, the relationship, and "mean grooming," i.e., threats to make them fearful and compliant such as lowering self-esteem, putting a child down, or threatening to kill their family, pet, or parents. (*Id.* at 108.) He explained that grooming is about testing boundaries and can happen in years, months, hours, or minutes. (*Id.* at 110, 119, 122-23.)

Pacult reviewed P.T.'s statement, officer reports, P.T.'s voluntary statement, statements from prior proceedings, school and psychiatric records, medical reports including the sexual assault exam report, a statement from P.T.'s mother, and P.T.'s psychiatric records of Drs. Racoma and Roitman. (*Id.* at 109-10, 118, 123.) He explained that "nice or positive grooming" was exhibited when Sampson asked for the location of a McDonald's and offered food. (*Id.*) He explained that asking the whereabouts of a McDonald's was a way to test the child's awareness of stranger-danger and level of functioning and receptiveness. (*Id.* at 120-21.) He explained that children love McDonald's so offering the food was a way of determining whether the child will get into the vehicle, i.e., a trust-building exercise. (*Id.*) He explained that offering money for yard work was also a "classic offender technique" as the lure of money appeals to children who love to have it, spend it, and for a child to have their own money, to earn money, is a significant hook in terms of getting the child to go into the offender's house. (*Id.* at 111-12, 122.) Pacult interpreted that as a test to see whether P.T. had enough trust in him to go to a foreign place where P.T. would be isolated in Sampson's home. (*Id.*) After the abuse, P.T. was offered whatever he wanted and was able to list candies, cookies, etc., which was potentially calculated to minimize the damage of what occurred, distract P.T.

with positive things so he will not report the abuse, or done with the hope to engage in further acts of abuse through bribery. (*Id.* at 113.) Pacult opined Sampson created a funhouse environment after the abuse and use of the firearm by offering to get candy and chips and playing music that P.T. said he liked. (*Id.* at 114.) Pacult also testified the use of the firearm (mean grooming) elicits tremendous fear in a child so the offender can potentially achieve complete compliance and non-disclosure of the abuse. (*Id.* at 112-13.)

### 2.    Standards for Admission of Expert Testimony

Before Sampson's second trial, the NSC recognized "grooming" is a "phenomenon that courts have recognized as generally accepted in the scientific community." *Perez v. State,* 313 P.3d 862, 869 (Nev. 2013) (citing cases). The NSC held evidence of "grooming" for sexual abuse was admissible where the expert "[g]enerally addressed how grooming occurs and its purpose" and offered "[i]nsight in the form of hypotheticals" that were based on the defendant's conduct and "indicated that such conduct was probably grooming behavior." *Id.* at 868. After *Perez*, but before Sampson's trial, the Nevada legislature enacted a statute allowing expert testimony concerning the behavior of a defendant in preparing a child for sexual abuse:[16]

> 1. In any criminal or juvenile delinquency action, expert testimony offered by the prosecution or defense which concerns the behavior of a defendant in preparing a child under the age of 18 years or a vulnerable person as defined in NRS 200.5092 for sexual abuse by the defendant is admissible for any relevant purpose. Such expert testimony may concern, without limitation:
>
>> (a) The effect on the victim from the defendant creating a physical or emotional relationship with the victim before the sexual abuse; and
>>
>> (b) Any behavior of the defendant that was intended to reduce the resistance of the victim to the sexual abuse or reduce the likelihood that the victim would report the sexual abuse.

NRS § 50.350.

---

[16]"Sexual abuse" includes lewdness with a child under NRS § 201.230 and sexual assault under NRS § 200.366. *See* NRS §§ 50.350(2), 432B.100(2), (4).

26

Expert testimony is admissible if (1) the expert is qualified in an area of specialized knowledge, (2) the specialized knowledge assists the trier of fact to determine a fact, and (3) the testimony is limited to the scope of specialized knowledge. *See* NRS § 50.275; *Perez,* 313 P.3d at 866 (citing *Hallmark v. Eldridge,* 189 P.3d 646, 650 (Nev. 2008)); *see also Higgs v. State*, 222 P.3d 648, 658 (Nev. 2010) (recognizing expert testimony can be scientific or nonscientific). When determining whether the expert "is qualified in an area of scientific, technical, or other specialized knowledge" factors to consider are "(1) formal schooling and academic degrees, (2) licensure, (3) employment experience, and (4) practical experience and specialized training." *Hallmark,* 189 P.3d at 651 (footnotes omitted). Once a trial court determines the expert is qualified, it must determine whether an expert's testimony will "assist the trier of fact." *Id.* This requires a trial court to consider whether the expert's opinion is relevant and the product of reliable methodology. The NSC has outlined five factors to consider when determining whether an opinion is based on reliable methodology: whether the opinion is (1) within a recognized field of expertise; (2) testable and has been tested; (3) published and subjected to peer review; (4) generally accepted in the scientific community (not always determinative); and (5) based more on particularized facts rather than assumption, conjecture, or generalization. *See id.* at 651-52 (footnotes omitted). These factors are not exhaustive, may be afforded varying weights, and may not apply equally in every case. *See id.; Perez*, 313 P.3d at 869. "[T]he admissibility of expert testimony is a matter for the sound discretion of the trial judge." *Townsend v. State,* 734 P.2d 705, 709 (1987).

### 3.    Analysis of Ground 3[17]

---

[17]In his Petition, Sampson includes a hyperlink to a scholarly article to support his claim that Pacult incorrectly "perpetuated a pervasive myth about child sexual abuse—that strangers are the most dangerous and common perpetrators." (ECF No. 88 at 20 n.3.) Respondents contend this Court should not consider the scholarly article because Sampson failed to develop it as part of the state-court record. (ECF No. 99 at 23.) Sampson does not address the article in his reply. (ECF No. 102 at 26-29.)

Generally, the merits of claims raised in a federal habeas corpus petition are decided on the record that was before the state court when it adjudicated a claim. *See*

27

Sampson has failed to establish a substantial claim that trial counsel was ineffective for failing to object and move to disqualify or strike Pacult's testimony or present a defense expert to refute Pacult's testimony. An objectively reasonable attorney could determine objection to Pacult's qualifications or to admission of Pacult's testimony about grooming techniques as preparation for sexual abuse was futile given Pacult's specialized knowledge, the decision in *Perez*, and the promulgation of NRS § 50.350 before Sampson's second trial. *See Jones*, 231 F.3d at 1239 n.8 (an attorney's failure to make meritless objections is not deficient performance under *Strickland*.) Sampson has also failed to establish any basis to conclude trial counsel could have located a qualified expert to refute Pacult's testimony.

Fairminded jurist would also agree trial counsel could reasonably conclude cross-examination of Pacult was preferable to drawing additional attention to Pacult's opinions about Sampson's grooming behavior by calling a defense expert as there was a risk the State's cross-examination of a defense expert would elicit agreement with Pacult's opinions. Fairminded jurists would thus agree Sampson has not established a substantial claim that trial counsel's failure to call a defense expert to counter Pacult's opinion about grooming fell outside the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689. Therefore, Ground 3 is dismissed as it lacks merit or is wholly without factual support, and Sampson failed to overcome the default. *See Martinez*, 566 U.S. at 14-16.

---

*Cullen*, 563 U.S. at 180-81. AEDPA restricts a federal habeas court's authorization to hold an evidentiary hearing or consider evidence where an applicant failed to develop the factual basis for a claim in state court proceedings. *See* 28 U.S.C. § 2254(e)(2).

The Court finds the purported scholarly article does not appear to have been developed in the state-court record. Even if the Court found Sampson had diligently developed the state-court record, Sampson nonetheless failed to provide either a copy of the article or a working hyperlink to it. (ECF No. 88 at 20 n.3, 102 at 26-29.) Because the Court has no access to the article, it need not determine whether to consider it. *See* LR IA 7-3(1)(c) ("The submitting party is responsible for the availability and functionality of any hyperlink."); LR IA 7-3(c)(2 ("Neither a hyperlink nor a site to which it refers will be considered part of the official record . . . If a party wishes to make any hyperlinked material part of the record, the party must attach the material as an exhibit.").

### D.      Ground 4—IAC—Admission of Firearm Conviction

Sampson alleges trial counsel provided ineffective assistance in violation of the Sixth Amendment by failing to object to the admission of Sampson's conviction for Possession of a Firearm by an Ex-Felon, to which he pleaded guilty during a bifurcated proceeding following the first trial. (ECF No. 88 at 21-23.) He claims the terms of his plea agreement prohibited the State from using that conviction at the second trial. (*Id.*) He claims he was prejudiced by counsel's omission because (1) he was denied the benefit of the bargain he struck with the State; and (2) the ruling admitting the prior conviction for impeachment coerced him to give up his right to testify. (*Id.*) Respondents argue Sampson fails to establish counsel was aware of the terms of the plea agreement. (ECF No. 99 at 25-27.) They contend Sampson was aware of the terms of the agreement yet did not object until sentencing. (*Id.*) They claim he was not prejudiced because his testimony from the first trial was admitted during the second trial, and he fails to establish how, but for the ruling admitting the firearm conviction, his live testimony would have changed the result of the second trial. (*Id.*)

### 1.      Additional Background

As explained above, for the first trial, Sampson was charged with six offenses, including (Count 6) Possession of a Firearm by an Ex-felon. (ECF No. 7-2 at 16-18.) Sampson pleaded guilty to Count 6 under a GPA. (ECF No. 31-2.) The parties informed the trial court that, in addition to the terms in the written GPA, "[i]n the event that the matter is remanded back for a new trial for any reason, whatsoever . . . *it's not an admission*, it would not be used in any subsequent trials":

THE COURT: Any negotiations as to this count?

[DEFENSE COUNSEL]: The only negotiations as to this count Your Honor—Your Honor were the fact that—uh—in order to keep it from being raised during the course of the jury trial, it was redacted out of the original, or the charging document for purposes of trial. Now it comes back in. By doing this, he—it does not [a]ffect any of the consequences of the jury trial, however in the event that the matter is remanded back for a new trial for any reason, whatsoever—uh—it's not an admission, it would not be used in any subsequent trials.

[THE STATE]: That's correct.

. . . .

THE COURT: With that having been said, Mr. Sampson, is that your understanding sir?

THE DEFENDANT: Yes, Your Honor.

(ECF No. 12-14 at 5.) A federal writ of habeas corpus required a new trial for Counts 1-5, but not Count 6.[18]

At the second trial, defense counsel verbally moved to preclude the State's use of the firearm conviction. (ECF Nos. 33-5 at 10-11, 34-2 at 70-77.) Defense counsel did not argue the admission of the firearm conviction was prohibited under the terms of the plea agreement; instead, counsel argued use of the firearm conviction was barred under NRS § 59.095, because it was more than 10 years since (1) the date the individual was released from custody; or (2) the expiration of the individual's parole, probation or sentence. (ECF No. 33-5 at 10-11.) The State argued the firearm conviction could be used to impeach Sampson should he testify at the second trial because the sentence was consecutive to the other counts and due to the federal writ, the sentence had not begun. (*Id.* at 11.) Later, the trial court held NRS § 50.095 permitted the State to impeach Sampson with the firearm conviction during the second trial should Sampson testify. (ECF No. 35-1 at 214.) Based on the court's ruling, defense counsel advised Sampson not to testify at the second trial. (ECF No. 36-1 at 222.) Sampson confirmed he would follow counsel's advice and not testify to avoid impeachment. (ECF No. 37-2 at 10.)

**2.     Analysis of Ground 4**

Sampson has established a substantial claim that trial counsel's failure to alert the trial court that the State's use of Sampson's admission for the firearm conviction was prohibited by the terms of the GPA constitutes deficient performance under *Strickland*. *See Martinez*, 566 U.S. at 14. Fairminded jurists could debate whether an objectively reasonable trial attorney would have, based on the reporter's transcript of the change of

---

[18]Case No. 3:11-cv-19-LRH-WGC (ECF Nos. 105, 107).

30

plea hearing, asserted a claim that Sampson's firearm conviction was inadmissible at the second trial. Based on defense counsel's explanation at the time of the entry of the plea, the plea agreement may have required only that the State not later use Sampson's *admission*—and counsel's remarks could be construed as prohibiting the use of Sampson's *admission* made during the plea hearing only in the event of a retrial for the firearm offense. On the other hand, the agreement might reasonably include use of the firearm conviction for any "any reason whatsoever" in any subsequent trials.

Sampson fails, however, to establish a substantial or meritorious claim that trial counsel's performance was prejudicial under *Strickland*. Even if counsel could have successfully moved to exclude the conviction based on the plea colloquy, and consequently, Sampson testified in person at the second trial, Sampson has not established there is a reasonable probability the result of the trial would have been different had he testified in person.[19] Again, Sampson speculates that his in-person testimony would have changed the trial outcome. But Sampson provides no basis to conclude his testimony would have been materially exculpatory the second time. And his

[19]Sampson made a similar argument during his state habeas appeal, and the NSC concluded he failed to demonstrate prejudice:

Appellant claims the district court deprived him of the constitutional right to testify in his own defense when it ruled that the State could use a prior felony conviction to impeach him if he testified at trial. The State maintains that the district court did not err in its ruling and argues that appellant failed to preserve this issue for appeal. To preserve this issue for appeal, a defendant "must make an offer of proof to the trial court outlining his intended testimony, and it must be clear from the record that, but for the trial court's in limine ruling, the defendant would have testified." *Warren v. State,* 121 Nev. 886, 894-95, 124 P.3d 522, 528 (2005). Appellant here did not make an offer of proof before the district court outlining his anticipated testimony. Furthermore, appellant failed to make a clear record that he would have testified but for the district court's ruling. As such, we decline to review on appeal this unpreserved error. *See Valdez V; State,* 124 Nev. 1172, 1190, 196 P.3d 465, 477 (2008) (recognizing this court's review of unpreserved error as discretionary).

(ECF No. 13-1 at 4-5.)

speculation falls short of the requirement of a substantial, not merely conceivable, likelihood of a different result. *See Harrington*, 562 U.S. at 112.

Ground 4 is denied because Sampson fails to establish a substantial claim that counsels' performance was prejudicial under *Martinez*, and even assuming he could overcome the procedural default of this claim, Sampson cannot establish that trial counsel's performance was prejudicial under *Strickland*.

### E.      Ground 5—Vindictive Sentencing

Sampson alleges the state district court's imposition of a sentence that is nine years longer than the initial sentence for identical offenses constitutes vindictive sentencing in violation of due process under the Fourteenth Amendment. (ECF No. 88 at 23-25.) He alleges the NSC unreasonably determined the second sentencing judge's involvement with Sampson's case was "attenuated," as the second sentencing judge was reversed by two different courts. (*Id.*) He alleges the NSC unreasonably failed to apply a presumption of vindictiveness required by Supreme Court authority because the trial court did not justify the longer sentence based on Sampson's conduct; rather it based the longer sentence improperly on evidence at trial about the victim's conduct. (*Id.*) Respondents argue the Supreme Court has not held a successful collateral attack on a conviction triggers a presumption of judicial vindictiveness at resentencing. (ECF No. 99 at 33-36.)

#### 1.      Additional Background

##### a.      The judge at the first trial imposed a 21-to-life sentence.

Nevada state district Judge Michael Douglas presided over Sampson's first trial, guilty plea, and sentencing. (ECF No. 31-5 at 2.) The State argued for a sentence of 30 years to life imprisonment. (*Id.* at 7-8.) The State argued P.T. was at the vulnerable age of 12 years old at the time of the offenses, and after the offenses, P.T. had "a lot of problems," was "acting out," had been "fighting with his brother," and went to "the juvenile hall a couple of times," because his mother could not control him; that he was "so angry" and "acts out all of the time" "consistent with a young man who has been through what

he's been through at the hands of Mr. Sampson." (*Id.* at 6-7.) The defense argued for concurrent sentences due to Sampson's age and ill health and because P.T.'s records at the time showed he had "problems in school prior to" the offenses, "was diagnosed with difficulties that made him a difficult child," was "in juvenile detention during the time of trial," and his acting out "may come more as a consequence of his father not being around, and then the pending loss of his mother." (*Id.* at 9-11.) Judge Douglas stated he "sat through trial," and understood Sampson was "steadfast from the beginning" that he was innocent, but the jury returned a guilty verdict. (*Id.* at 11-12.) Judge Douglas sentenced Sampson to an aggregate sentence of 21 years to life, running Counts 1-5 concurrent with each other, and Count 6 consecutive to each other count.[20] (*Id.*)

### b. Reversal of Judge Leavitt's orders led to a new trial

Nevada state district court Judge Michelle Leavitt presided over Sampson's state postconviction petition, in which Sampson alleged, among other things, trial counsel was ineffective during the first trial for failing to investigate and present expert testimony regarding P.T.'s Oppositional Defiance Disorder (ODD) diagnosis. (ECF No. 71-2 at 2-5.) Judge Leavitt denied the petition, Sampson appealed, and the NSC found Judge Leavitt erred by failing to appoint counsel, failing to hold an evidentiary hearing, and by finding trial counsel's failure to investigate and present expert testimony about P.T.'s ODD diagnosis was not deficient under *Strickland*. (*Id.* at 5-8.) The NSC reversed and remanded for a determination whether counsel's deficient performance was prejudicial. (*Id.*) On remand Judge Leavitt concluded Sampson was not prejudiced by counsel's

---

[20]Judge Douglas imposed sentences for the counts as follows: (1) Count 1—First Degree Kidnapping—Five years to life imprisonment; (2) Count 2—Lewdness with a Minor Under 14—10 years to life imprisonment; (3) Count 3—Lewdness with a Minor Under 14—10 years to life imprisonment; (4) Count 4—Attempted Sexual Assault of a Minor under 14—32 to 144 months imprisonment; (5) Count 5—Sexual Assault of a Minor under 14 years—20 years to life imprisonment; and (6) Count 6—Possession of a firearm by an ex-felon—12 to 48 months imprisonment. (*Id.* at 11-12.)

33

failure to investigate and call an expert to testify about P.T.'s ODD diagnosis and denied the petition.[21] Sampson appealed and the NSC affirmed.[22]

Sampson raised the IAC claim in his federal habeas petition and the Federal District Court denied the claim.[23] Sampson appealed and the Ninth Circuit Court of appeals reversed and remanded with instructions to grant a conditional writ of habeas corpus on Sampson's claim that trial counsel was ineffective in failing to investigate and call an expert to testify concerning P.T.'s ODD diagnosis.[24] The Federal District Court granted the writ directing the State to retry or release Sampson. (ECF No. 31-7.)

### c.    Evidence at trial about P.T.

Acting on the federal writ of habeas corpus, Judge Leavitt presided over Sampsons' second trial. (ECF No. 33-5 at 2.) P.T. testified that he was 12 years old at the time of the offenses in 2002 and was 27 years old when he testified at the second trial in 2017. (ECF No. 35-1 at 50.) P.T. obtained felony convictions in 2008 for carrying a concealed weapon and 2012 for possession of a firearm by an ex-felon. (*Id.* at 96-97.) P.T.'s mother, Johnson, testified that before the incident with Sampson, P.T. was diagnosed with attention deficit hyperactivity disorder ("ADHD") and ODD. (*Id.* at 29.) Johnson admitted her initial response to P.T.'s claims was to tell him to quit lying because he lied in the past. (*Id.* at 44.) She testified that, after the incident, P.T. was "more angry," "just get angry real fast," and "you say the least little thing, he angry." (*Id.* at 42.) P.T.'s brother, D.T., testified that P.T. did not discuss the events of that day, "don't walk nowhere at all," "everything is just bottle up," and P.T. vomited on the way home from a meeting with the prosecution a week before the second trial. (*Id.* at 22-23.)

[21]Case No. 3:11-cv-00019-LRH-WGC (ECF No. 16-12 at 4-6).

[22]Case No. 3:11-cv-00019-LRH-WGC (ECF No. 16-22).

[23]Case No. 3:11-cv-00019-LRH-WGC (ECF Nos. 44 at 39-44, 86 at 27-31).

[24]Case No. 3:11-cv-00019-LRH-WGC (ECF No. 105).

During the defense case in chief, Dr. Norton Roitman testified that he is board certified in child, adolescent, and general psychiatry and a Distinguished Fellow of the American Psychiatric Association. (ECF No. 37-2 at 14.) He reviewed P.T.'s psychiatric records, which predated the first sentencing hearing, and provided a review of the information concerning P.T. that were contained in those records, along with his opinions concerning P.T.'s behaviors and diagnoses.[25] (*Id.* at 16.) Roitman agreed with the ODD diagnosis because each of the following symptoms (from the Diagnostic and Statistical Manual of Mental Illness ("DSM manual")) for that diagnosis are included in P.T.'s psychiatric records from before the first trial: frequent temper tantrums, a lot of arguing with adults, questioning rules, active defiance, refuses to comply with adult requests and rules, deliberate attempts to annoy or upset people, blaming others for his or her mistakes or misbehavior, easily annoyed by others, frequent anger and resentment, mean and hateful, talking when upset, and spiteful attitude and revenge seeking. (*Id.* at 16-18.) Roitman explained that a primary characteristic of those with ODD is they blame others instead of taking responsibility, which is basically lying by saying "it wasn't me, it was someone else." (*Id.* at 21-22.)

Roitman testified that, according to Clark County Juvenile Justice Services records, despite efforts of his teachers, P.T. continued defiance and unruly behavior in the classroom, there was no reasoning with him, and he was volatile and physically harmful toward family, i.e., attacked his mother with a statue (no charges filed) and stabbed his brother (charges filed). (*Id.* at 18-19.) Roitman explained that P.T. was described consistently, from early childhood, as overactive, inattentive, hyperactive, hard to discipline, cranky, overly aggressive, a loner, and withdrawn. (*Id.* at 20-21.) He had a poor ability to get along with other children in school and in the neighborhood. (*Id.*) He

---

[25]At trial, the parties stipulated to the admission of P.T.'s "school and psychological records" related to his diagnosis for ODD. (ECF No. 35-1 at 6-7.) Defense Exhibit A (ECF No. 73-1) includes school and psychology records concerning P.T. and was referred to during Pacult and Roitman's testimony. (*See e.g.,* ECF No. 37-2 at 18.)

exhibited misbehavior in class, trouble falling asleep, sometimes roamed the house at night, had a quick temper where anything set him off, especially not getting his way, and when angry, made verbal threats and became physically aggressive. (*Id.*)

Roitman also explained that P.T. was diagnosed with ADHD. (*Id.* at 22.) Roitman explained ODD is under the disruptive and behavior category while ADHD is a neurocognitive disorder. (*Id.* at 23.) He explained a person with ADHD can have a perfect childhood, nutrition in utero, love, and good discipline and structure, but the theory is there's something wrong in the brain, something going on in the nervous system, as they cannot stick on topics. (*Id.* at 22-23.) On the other hand, with ODD, there's something going on in the behavior and the interactions and the goal is to get the individual to a point where they can stop, analyze, make the best decision, and think ahead, while with ADHD, those techniques are less likely to help. (*Id.*)

Roitman explained that P.T. was treated with Adderall, a stimulant that helps one stay on task, and Zyprexa, which is for the worst of psychiatric illnesses, and designed for people whose minds are out of control with paranoia and suspiciousness, hearing voices, delusional, as if the radio is talking straight to them. (*Id.* at 23-24.) The relatively low dose of Zyprexa suggested it was used to tranquilize P.T. so teachers and parents could deal with him. (*Id.* at 24-25.) Although Adderall is the gas and Zyprexa the brake, this is frequently prescribed, so a patient receives enough stimulation to pay attention, but not so much as to be overactive. (*Id.*) Roitman believed this combination of prescriptions was a sign P.T.'s treatment plan wasn't working. (*Id.* at 25-26.)

Roitman testified that he reviewed tests and reports that led him to believe a more appropriate diagnosis for P.T. was Conduct Disorder. (*Id.* at 32.) He reviewed records indicating P.T. scored low on the truthfulness scale, which gives "clinicians some pause compared to a . . . person who scores in the high level of that test." (*Id.* at 29-31.) Roitman explained, "[u]sually kids who are just oppositional defiant don't get arrested. They're just pests"; requiring e.g., parent/teacher conferences, expulsion from school; but "when

36

community authorities get involved, then you start thinking, maybe this is more serious than ODD. Maybe it's conduct disorder." (*Id.* at 31-32.)

Roitman explained that Conduct Disorder "means somebody who just doesn't seem to care what other people think. They do what they want to do" such as they "bully, threaten, or intimidate[], initiate[] physical fights," use weapons (a bat, broken bottle, knife, or gun), are physically cruel to people or animals, engage in mugging and purse snatching, or force someone into sexual activity. (*Id.* at 32-34.) They enjoy destroying other people's property, e.g., deliberately set fires with the intention to cause harm, draw graffiti, and break into homes, cars, or buildings. (*Id.*) They often lie to obtain goods or favors or to avoid obligations. (*Id.*) Beginning at age 13, they run away from home overnight at least twice and are often truant from school. (*Id.*) The behavior must cause significant impairment in school, academic, or occupational functioning and the diagnosis is not given to those over 18 years of age. (*Id.*)

Roitman did not examine P.T., but he opined that, based on the records, P.T. likely had Conduct Disorder in 2001. (*Id.* at 39-41, 53.) Roitman agreed that lying and deceitfulness are not required symptoms in the DSM manual for an ADHD or ODD diagnosis. (*Id.* at 47-48.) Roitman admitted the trauma involved in this case could cause Conduct Disorder but explained that, when there are preexisting problems, the question whether the trauma caused the behavior is murky. (*Id.* at 57-58.)

### d.    Judge Leavitt imposed a 30-year-to-life sentence.

The State submitted a Sentencing Memorandum arguing for a life sentence without the possibility of parole under Nevada's large habitual criminal statute, or alternatively, a consecutive sentence for "either Count 2 or Count 3" of 10 years to life imprisonment to "bring the total aggregate sentence to 30 years to life." (ECF No. 37-7 at 12-13.) The State argued victim-impact evidence that comes out during a second trial is appropriate evidence to consider when making a record to justify increasing a sentence and that the judge heard victim impact information that was not, and could not have been, presented

to Judge Douglas in 2003. (*Id.* at 10-11 (citing *North Carolina v. Pearce*, 395 U.S. 711 (1969), *overruled on limited grounds by Alabama v. Smith*, 490 U.S. 794 (1989)).)

The State argued the jury was informed during the second trial that, after the offenses, P.T.'s "life took a marked change for the worse," because P.T. was introduced to the juvenile justice system, had arrests for battery with a deadly weapon, petty larceny and a bench warrant for his arrest. (ECF No. 37-7 at 8.) The State argued P.T. was in juvenile detention for attempting to stab his brother and his brother testified about changes in P.T.'s behavior, including emotional detachment and anger. (*Id.* at 8, 11.) The State argued P.T.'s "medical and psychological records" revealed P.T.'s behavior spiraled out of control after the sexual assault, directing attention to Kimberly Scott's evaluation in 2003, in which she concluded "[P.T.] presented as a deeply disturbed young man. The combination of his past molestation and his mother's current illness appear to be contributing to P[.T.]'s level of disturbance," and, in Scott's opinion, P.T. "is a high risk to become angry or rageful in the future." (*Id.* at 11-13.) The State argued P.T.'s "psychological reports noted that after his kidnapping and sexual assault P.T. became angry all the time and would fly into blind fits of rage, breaking everything in sight. (*Id.* at 8.) P.T.'s score on the Violence Scale was in the maximum risk range, when frustrated or angry. (*Id.*) He was quick to become agitated, uncontrolled, threatening or even combative. (*Id.*) Whether boisterous, distraught or disorderly, P.T.'s behavior had an unpredictable ugly or violent quality to it. (*Id.*) P.T. had been in counseling and subject to medication for the ADHD and ODD, but DFS Psychological Services believed P.T. was in trouble and in need of psychiatric care. (*Id.*)

The State further argued that, as P.T.'s life progressed into his late teenage and adult years, he "began smoking marijuana, using cocaine, and drinking alcohol," and affiliated with and was a confirmed member of various criminal street gangs. (*Id.* at 8-9.) The State argued P.T.'s criminal history included: (1) a 2008 felony conviction for Carrying a Concealed Weapon; (2) a 2008 arrest for Assault with a Deadly Weapon and

misdemeanor conviction for Disorderly Conduct; (3) violations of probation in 2009; and (4) a conviction by guilty plea to Attempt Possession Firearm Ex-Felon, for which he violated probation. (*Id.* at 9.)

The State argued the court should consider the updated Presentence Investigation report concerning P.T.'s statements about the impact of the crimes on his life:

> The victim was contacted telephonically[.] On August 28, 2017, he reported that ever since this happen he started getting into trouble and things just got worse. He does not trust a lot [of] people and he will not walk alone[;] he has to travel in a car. He is still traumatized over the events and he is going to have a child soon and would not want this to happen to his child or any other child. He is concerned that if Sampson is released from prison he will do this again to another innocent child. The victim stated he was 12 years old when Sampson put a gun to his head and he had never had a gun pointed at him. What he did to him was cause a lot of trauma and messed up his life. The victim reported he received counseling for about two years and it was painful and very embarrassing to have to share what happened to him. It was embarrassing to know that other kids knew about it. He was taunted by other kids because of what happened to him and this traumatized him even more. The victim is asking the Court to sentence Sampson to prison for the rest of his life . . ..

(*Id.* at 10-11.)

At the sentencing hearing, the State argued Judge Leavitt heard additional evidence in the second trial that warranted an increased sentence. (ECF No. 37-8 at 4-8.) The State argued P.T.'s life "went down the tubes" and Sampson "ruined" P.T.'s life as P.T. later acquired repeat arrests, fights, gun charges, gang involvement, teasing by other children, shame, and was never the same. (*Id.*) The State argued "a lot of times we just hope, well, I hope this victim can kind of overcome it," but P.T. "didn't", and an increased sentence was appropriate "based on this victim impact evidence," and the testimony of P.T.'s brother. (*Id.*)

Defense counsel argued, among other things, the Court could consider Sampson's conduct after the initial sentence was imposed and during the intervening 13 to 14 years, including 5000 or so days in custody, "[t]here's never been a problem. He has not caused any other problems, so there's nothing there for the Court to consider." (*Id.* at 17.) Defense counsel argued that if Judge Leavitt imposed a lengthier sentence, it would be construed

39

as vindictive. (*Id.*) Sampson personally pointed out that, according to the defense expert, P.T. was arrested in May 2000 when he was 10 and 11 years old and had 20 to 25 calls to the principal's office. (*Id.* at 8.)

Judge Leavitt increased Sampson's overall sentence by nine years, imposing a sentence of 30 years to life, by running the 20-to-life sentence for Count 5 (Sexual Assault with a Minor Under the Age of Fourteen) consecutive to the 10-to-life sentence for Count 3 (Lewdness with a Child Under the Age of Fourteen). (*Id.* at 19-20.) Judge Leavitt confirmed the evidence she relied upon for the increased sentence was not Sampson's conduct, but P.T.'s testimony, victim impact statements, and the medical psychological records that talked about evaluation of P.T. after the offenses:

> [THE STATE]: [F]or the record could you state the evidence that you had heard either during the presentation of the trial or during sentencing or during sentencing letters that you based your decision to run Count 5 consecutive to Count 3.
>
> THE COURT: The evidence the Court relied upon was the testimony of [P.T.] as well as any victim impact statements that were presented on behalf of the victim. I didn't rely upon anything the Defendant had done, because as [defense counsel] said it appears that the Defendant has had no problems. So, it was based on the victim and the victim's testimony, which is part of the record and also part of the State's Sentencing Memorandum.
>
> [THE STATE]: Just one point of clarification. Did you base your decision at all based on the medical psychological records that were admitted—
>
> THE COURT: Yes.
>
> [THE STATE]: —that talked about a post evaluation of [P.T.] post the attack by the Defendant?
>
> THE COURT: YES.

(*Id.* at 21.)

### 2. Standards for Evaluating Vindictive Sentencing

#### a. Reasonable likelihood of actual vindictiveness

The Supreme Court has held due process of law "requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial." *North Carolina v. Pearce*, 395 U.S. 711, 725 (1969) *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989).

40

Because "the fear of such vindictiveness may unconstitutionally deter a defendant's exercise of the right to appeal or collaterally attack his first conviction, due process also requires that a defendant be freed of apprehension of such a retaliatory motivation on the part of the sentencing judge." *Id.* "[I]n order to assure the absence of [a retaliatory] motivation," "whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for his doing so must affirmatively appear." *Id.* at 726. "[T]hose reasons must be based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding," and "the factual data upon which the increased sentence is based must be made part of the record, so that the constitutional legitimacy of the increased sentence may be fully reviewed on appeal." *Id.* When these conditions are not met, a presumption arises that a greater sentence has been imposed for a vindictive purpose—a presumption that must be rebutted by "objective information . . . justifying the increased sentence." *Smith*, 490 U.S. at 798-99 (citing *Texas v. McCullough*, 475 U.S. 134, 142 (1986), and quoting *United States v. Goodwin*, 457 U.S. 368, 374 (1982)). In *Pearce*, the defendant was convicted of one count of assault with intent to commit rape and originally sentenced to 12 to 15 years. *See* 395 U.S. at 713. Following a successful appeal, Pearce was again convicted, and a different judge sentenced him to a term longer than originally imposed. *See id.* The Supreme Court reversed Pearce's conviction because the State failed to offer any reason or justification for the longer sentence either "at the time the increased sentence was imposed," or "at any stage in th[e] habeas corpus proceeding." *Id.* at 726.

The Supreme Court later explained that its "sweeping" holding in *Pearce* "do[es] not apply in every case where a convicted defendant receives a higher sentence on retrial." *Smith*, 490 U.S. at 799 (citing *McCullough*, 475 U.S. at 138.) The Court reiterated, "'the evil the *Pearce* Court sought to prevent' was not the imposition of 'enlarged sentences after a new trial' but 'vindictiveness of a sentencing judge.'" *Id.* (citations omitted). The Court held that "[b]ecause the *Pearce* presumption 'may operate in the

absence of any proof of an improper motive and thus . . . block a legitimate response to criminal conduct,'" application of the *Pearce* presumption is limited to "circumstances" where "there is a 'reasonable likelihood' that the increase in sentence is the product of actual vindictiveness on the part of the sentencing authority." *Id.* (internal citation omitted). "Where there is no such reasonable likelihood, the burden remains upon the defendant to prove actual vindictiveness." *Id.* at 799-800 (citations omitted).

In *Smith*, the Supreme Court held no presumption of vindictiveness arose where the defendant's first sentence was based on a guilty plea and a second harsher sentence following a trial with the same judge, because during the trial, the judge became aware of new information that persuaded the judge the original sentence was too lenient. *See* 490 U.S. at 795-97. The sentencing judge explained that he imposed the harsher sentence because, when he accepted the defendant's guilty plea he knew only defendant's version of the events, and during a full jury trial he heard all the evidence, including the nature of the crimes and the impact on the victim. *See id*. The Supreme Court reasoned, "[e]ven when the same judge imposes both sentences, the relevant sentencing information available to the judge after the plea will usually be considerably less than that available after a trial." *Id.* at 801. In such cases, there are "enough justifications for a heavier second sentence that it cannot be said to be more likely than not that a judge who imposes one is motivated by vindictiveness." *Id.* at 802*.

### b.    Different second sentencers

The Supreme Court has ruled that the *Pearce* presumption is inapplicable in certain circumstances where the second sentencer was different than the first sentencer.

The Supreme Court held the *Pearce* presumption inapplicable where the second sentencer was a higher court in a two-tiered system for adjudicating less serious criminal cases. *See Colten v. Kentucky*, 407 U.S. 104, 116-17 (1972). There, Defendant Colten was convicted of misdemeanor disorderly conduct and fined $10. *See id.* at 107-08. Colten exercised his right under Kentucky's two-tiered system to a trial *de novo* in a court

of general jurisdiction where he was again convicted but instead fined $50. *See id.* Colten claimed the increased punishment was impermissible under *Pearce*. *See id.* at 115. The Supreme Court disagreed finding no inherent possibility of vindictiveness because, although the second court knew Colten's prior sentence was only $10, it (1) "was not the court with whose work Colten was sufficiently dissatisfied to seek a different result on appeal;" (2) was not "asked to do over what it thought it had already done correctly[;]" and (3) was not "asked to find error in another court's work." *Id.* at 117 n.14.

In *Chaffin v. Stynchcombe*, the Supreme Court held the *Pearce* presumption inapplicable to a harsher sentence imposed by a jury following retrial because the jury for the second trial received identical instructions on the permissible range of punishment as the jury for the first trial and the parties agreed "the [second] jury was not aware of the length of the sentence meted out by the former jury." 412 U.S. 17, 19-20 (1973). The Supreme Court reasoned, in those circumstances, "the jury, unlike the judge who has been reversed, will have no personal stake in the prior conviction and no motivation to engage in self-vindication." *Id.* at 27. The Court additionally pointed out that "[t]he jury [without knowledge of a prior sentence] is unlikely to be sensitive to the institutional interests that might occasion higher sentences by a judge desirous of discouraging what he regards as meritless appeals." *Id.*

The Supreme Court has also declined to impose the *Pearce* presumption to a harsher sentence imposed by a judge following a retrial, where a jury previously imposed a lower sentence. *See McCullough*, 475 U.S. 134. There, defendant McCullough was convicted of murder, and elected to be sentenced by the jury, which imposed a 20-year sentence. *See id.* at 135-36. The same trial judge thereafter granted McCullough's motion for new trial and McCullough was retried and convicted. *See id.* The second time, McCullough elected to have the judge who had granted his motion for new trial impose the sentence and the judge imposed a sentence of 50 years in prison. *See id.* The Supreme Court first reasoned that, "'unlike the judge who has been reversed,' the trial

43

judge here had 'no motivation to engage in self-vindication'" and the second trial came about because that judge granted the motion for a new trial after agreeing prosecutorial misconduct required it. *Id.* at 139 (citing *Chaffin*, 412 U.S. at 27). Under those circumstances the Court said there was "no justifiable concern about 'institutional interests that might occasion higher sentences by a judge desirous of discouraging what he regards as meritless appeals.'" *Id.* at 139.

The Court in *McCullough* rejected application of the *Pearce* presumption "because different sentencers assessed the varying sentences that McCullough received," and "[i]n such circumstances, a sentence 'increase' cannot truly be said to have taken place." *Id.* at 140 (quoting *Colten*, 407 U.S. at 117 ("It may often be that the [second sentencer] will impose a punishment more severe than that received from the [first]," however, "it no more follows that such a sentence is a vindictive penalty for seeking a [new] trial than that the [first sentencer] imposed a lenient penalty.")). The second sentencer in *McCullough* provided an "on-the-record, wholly logical, nonvindictive reason for the [longer] sentence." *Id.* at 140-41, 144. "[T]he trial judge stated candidly her belief that the 20-year sentence respondent received initially was unduly lenient in light of significant evidence not before the sentencing jury in the first trial." *Id.* The Supreme Court in a footnote explained that, although "some courts" concluded the presumption of vindictiveness applies even where different sentencing judges are involved, the Supreme Court did not previously address that issue:

> *Pearce* itself apparently involved different judges presiding over the two trials, a fact that has led some courts to conclude by implication that the presumption of vindictiveness applies even where different sentencing judges are involved. *See, e.g., United States v. Hawthorne*, 532 F.2d 318, 323 (3d Cir. 1976). That fact, however, may not have been drawn to the Court's attention and does not appear anywhere in the Court's opinion in *Pearce*. Clearly the Court did not focus on it as a consideration for its holding. *See Hardwick v. Doolittle*, 558 F.2d 292, 299 (5th Cir. 1977). Subsequent opinions have also elucidated the basis for the *Pearce* presumption. We held in *Chaffin v. Stynchcombe*, 412 U.S. 17 (1973) for instance, that the presumption derives from the judge's "personal stake in the prior conviction," *id.,* at 27, a statement clearly at odds with reading

*Pearce* to answer the two-sentencer issue. We therefore decline to read *Pearce* as governing this issue. *See also* n.4, *infra*.

*McCullough*, 475 U.S. at 140-41 n.3 (internal citations omitted).

### c.      Applications of the *Pearce* presumption

After *McCullough*, most federal circuits held the *Pearce* presumption inapplicable where the second sentencer is a different judge in the same court and the record contains non-vindictive reasons for a more severe sentence.  *See United States v. Rodriguez*, 602 F.3d 346, 358-60 (5th Cir. 2010) (joining "seven sister circuits" that do not apply the presumption when different judges preside over the first and second sentencing, but in that case, the second judge, among other things, "stated more than sufficient reasons for the greater sentence."); *United States v. Anderson*, 440 F.3d 1013, 1016-17 (8th Cir. 2006) (joining other circuits that interpret the Supreme Court cases to hold no presumption of vindictiveness arises when a different judge imposes a more severe sentence during resentencing if the record contains non-vindictive reasons for the more severe sentence, and ruling the presumption inapplicable where the second judge explained reasons for higher sentence unrelated to prior appeal) (citing *Macomber v. Hannigan*, 15 F.3d 155, 156-57 (10th Cir. 1994) (holding presumption inapplicable where the second harsher sentence was the product of a fresh examination of the facts, an independent exercise of discretion, and the second judge who imposed a more severe sentence provided an "on-the-record, wholly logical, nonvindictive reason for the [harsher] sentence."); *United States v. Newman*, 6 F.3d 623, 630-31 (9th Cir. 1993) (holding presumption inapplicable where different judge stated reasons for imposing a "wholly logical" sentence); *United States v. Cheek*, 3 F.3d 1057, 1064 (7th Cir. 1993) (holding presumption inapplicable because there was no basis to conclude the second judge was "more likely than not" motivated by vindictiveness and the judge identified sufficient justification for heavier sentence); *Rock v. Zimmerman*, 959 F.2d 1237, 1257 (3d Cir. 1992), *overruled on other grounds by Brecht v. Abrahamson*, 507 U.S. 619 (1993) (holding the *Pearce* presumption does not apply when the record provides affirmative

45

assurance that the harsher sentence imposed by a second sentencer reflects a fresh look at the facts and an independent exercise of discretion); *United States v. Perez*, 904 F.2d 142, 145-46 (2d Cir. 1990) (finding no realistic motive for vindictive sentencing where "prior reversal was based on a ruling by a judge other than [the sentencing judge].")).

In the context of review under AEDPA, the Sixth Circuit has held that *McCullough* constitutes clearly established federal law that the presumption is not applicable where a different judge imposes a harsher sentence than the first sentencing judge, "absent other circumstances demonstrating a need to guard against vindictiveness" i.e., "the presumption applies only where the circumstances give rise to a 'reasonable likelihood' that the sentence increase was the product of judicial vindictiveness." *Goodell v. Williams*, 643 F.3d 490, 499 (6th Cir. 2011); *but see Parmelee v. Clarke*, 251 F. App'x 450, 452 (9th Cir. 2007) (unpublished) ("[t]here is no clearly established Supreme Court precedent that gives rise to a presumption of vindictiveness when a different judge imposes the second, more severe, sentence.").

### 3.    NSC's Determination

The NSC rejected this claim on direct appeal finding the presumption of vindictiveness inapplicable because Judge Leavitt did not preside over the first trial or sentencing and had an attenuated connection to the Ninth Circuit's reversal before she presided over Sampson's second trial and imposed a harsher sentence:

> [A]ppellant argues that his increased sentence was the result of judicial vindictiveness in the resentencing process.
>
> > [FN 1] Public defender offices throughout Nevada and the Nevada Attorneys for Criminal Justice submitted an amicus brief in support of appellant's judicial vindictiveness claim.
>
> *Appellant's increased sentence was not the result of judicial vindictiveness*
>
> Appellant claims that because he received an increased sentence upon retrial, judicial vindictiveness on the part of the district court must be presumed. His argument relies substantially on *North Carolina v. Pearce,* 395 U.S. 711 (1969), *limited by Alabama v. Smith,* 490 U.S. 794 (1989). In *Pearce,* the United States Supreme Court held that a defendant has a due process right not to be subjected to vindictive sentencing after successfully appealing a conviction. *Id.* at 725. To assure the absence of judicial vindictiveness, the Court established a presumption of vindictiveness

"whenever a judge imposes a more severe sentence upon a defendant after a new trial," and the reasons for enhancement do not "affirmatively appear." *Id.* at 726. To be clear, this presumption "do[es] not apply in every case where a convicted defendant receives a higher sentence on retrial." *Texas v. McCullough,* 475 U.S. 134, 138 (1986). Rather, the Supreme Court clarified in subsequent cases that in order for the presumption to attach, there must be a "reasonable likelihood" of actual vindictiveness. *Alabama v. Smith,* 490 U.S. 794, 799 (1989) (internal quotation marks omitted).

We recently held that there is no such likelihood where a different judge imposes a more severe sentence than the first judge after a new trial. *Bowser v. State,* 135 Nev., Adv. Op. 15, ___ P.3d ___ (2019). Relying on *Pearce* and its progeny, we explained that "there is no reason to presume that the second judge. had a personal stake in the outcome of the first trial or sentencing, or a motivation to retaliate for a successful appeal." *Id.*

Here, Judge Leavitt did not preside over or impose the sentence in appellant's first trial.

[FN 2] We acknowledge that Judge Leavitt previously denied relief to appellant in a post-conviction proceeding related to the instant proceeding, but are not persuaded that Judge Leavitt's attenuated connection to the Ninth Circuit's reversal presents the classic concern that arises where a trial judge has been reversed. *See McCullough,* 475 U.S. at 139 ("The presumption of *Pearce* does not apply in situations where the possibility of vindictiveness is this speculative, particularly since the presumption may often operate in the absence of any proof of an improper motive . . ." (internal quotation marks omitted)); *see also Colten v. Kentucky,* 407 U.S. 104, 116-17 (1972) (refusing to apply the presumption where "the court which conducted [defendant's] trial and imposed the final sentence was not the court with whose work [defendant] was sufficiently dissatisfied to seek a different result on appeal; and it is not the court that is asked to do over what it thought it had already done correctly.").

We therefore reject appellant's contention that he is entitled to a presumption of judicial vindictiveness.

[FN 3] We note that, in general, such a conclusion does not foreclose the possibility of a successful claim for judicial vindictiveness. *See McCullough,* 475 U.S. at 138 ("Where the [presumption] of *Pearce* does not apply, the defendant may still obtain relief if he can show actual vindictiveness upon resentencing."). However, here, appellant relied solely on the presumption and failed to demonstrate *actual* vindictiveness.

(ECF No 39-4 at 3-4.)

### 4.    Analysis of Ground 5

The NSC unreasonably applied *Pearce* and its progeny for its determination that the presumption of vindictiveness does not apply. In *Smith*, the Supreme Court clarified the presumption of vindictiveness applies to "circumstances" where "there is a

'reasonable likelihood' that the increase in sentence is the product of actual vindictiveness on the part of the sentencing authority." *Smith*, 490 U.S. at 799. All fairminded jurists would agree the objective circumstances presented here exhibit a reasonable likelihood the increased sentence was the product of actual vindictiveness.

First, the NSC unreasonably determined the record demonstrates Judge Leavitt's relationship to the Ninth Circuit's reversal was attenuated. *See* 28 U.S.C. § 2254(d)(2). Judge Leavitt's postconviction rulings were twice reversed and ultimately resulted in Sampson's second trial: (1) the NSC reversed Judge Leavitt's determination that Sampson's trial counsel's performance was not deficient under *Strickland* and because she afforded Sampson no counsel and no evidentiary hearing during the state collateral proceeding; and (2) the Ninth Circuit Court of Appeals reversed Judge Leavitt's finding that Sampson was not prejudiced under *Strickland* by trial counsel's deficient performance during the first trial. *See McCullough* 475 U.S. at 138-39; *see also Chaffin*, 412 U.S. at 26-28 ("A judge who has been reversed, will have [a] personal stake in the prior conviction and motivation to engage in self vindication."). Thus, fairminded jurists would agree the record demonstrates by clear and convincing evidence that Judge Leavitt's relationship to the case and the reason for the second trial was not attenuated. *See* 28 U.S.C. § 2254(e)(1).

Second, the NSC unreasonably applied *Pearce* and its progeny because Judge Leavitt's imposition of the lengthier sentence was not, as the Supreme Court has instructed, based on "objective information concerning identifiable conduct *on the part of the defendant occurring after* the time of the original sentencing proceeding." *Pearce*, 395 U.S. at 726 (emphasis added). Judge Leavitt expressly stated she did not increase Sampson's sentence because of anything Sampson did after the original sentencing proceeding that was conducted in 2003. The record shows Sampson's conduct after the original sentencing proceeding was exemplary. Judge Leavitt instead relied on the conduct of P.T. There is, however, no objective evidence establishing Sampson's actions

after the original sentencing proceeding were the cause of P.T.'s conduct and decisions to join gangs or commit felonies after the original sentencing. Although Judge Leavitt relied on evidence that P.T. suffered mental anguish after the original sentencing; nothing indicates Sampson's actions after the original sentencing proceeding were responsible for P.T.'s mental suffering. Judge Leavitt relied on P.T.'s school and psychological records (Defense Exhibit A), including the Scott report in 2003, but those records and opinions were generated before the original sentencing proceeding.

Under the circumstances, the NSC was objectively unreasonable in its application of *Pearce* and its progeny. *See* 28 U.S.C. § 2254(d). The Court finds the NSC unreasonably failed to apply a presumption of vindictiveness. Such a presumption was applicable to Sampson's increased sentence as the record demonstrates circumstances indicating "there is a 'reasonable likelihood' that the increase in sentence is the product of actual vindictiveness on the part of the sentencing authority." *Smith*, 490 U.S. at 799.

Applying *de novo* review to the determination whether the State has rebutted the presumption by "objective information . . . justifying the increased sentence," the Court determines the State failed to do so. *Smith*, 490 U.S. at 798-99. Sampson was sentenced for identical crimes in 2003 and 2017. The State presented no objective evidence that Sampson took actions after his initial sentence in 2003 that justified an increased sentence, from 21 to 30 years to life imprisonment, by the time of the second sentencing in 2017. The evidence of P.T.'s mental anguish concerning his victimization existed at the time of the original trial and sentencing proceeding. The State presented no objective evidence that P.T.'s anguish and behavior after the original sentencing proceeding was directly caused by any actions Sampson took after the original sentencing. The State presented nothing that justified the nine-year increase in the original sentence for crimes of conviction identical to those for which Sampson was sentenced after the first trial, and which were essentially based on the same evidence and testimony presented at the first trial.

For the foregoing reasons, the Court grants the writ on Ground 5, vacates the state court judgment and directs the state district court to enter an amended judgment imposing a sentence identical to the sentence imposed by Judge Douglas in 2003. (ECF No. 31-5 at 11-12); *see, e.g.*, *Pearce*, 395 U.S. at 726 (affirming the Fourth Circuit's affirmance of the United States District Court's order releasing petitioner because he served the maximum term imposed on him at his original trial notwithstanding that on retrial, after successful post-conviction attack, he was sentenced to a longer term); *see also Pearce v. State of N.C.*, 397 F.2d 253 (4th Cir. 1968).

### F.    Ground 6—IAC—Respond to State's Sentencing Memorandum

Sampson alleges trial counsel provided ineffective assistance in violation of the Sixth Amendment by failing to respond to the State's Sentencing Memorandum urging a more severe sentence for identical crimes of conviction. (ECF No. 88 at 25-31.) Sampson alleges counsel should have argued that, before the crimes, P.T. had a documented mental health history that included delinquency, criminal behavior, and emotional and physical outbursts. (*Id.*) He claims he was prejudiced because after the second trial, the trial court imposed a harsher sentence for identical crimes based on P.T.'s history after the crimes. (*Id.*) Respondents argue Sampson cannot establish trial counsel's performance was deficient because other evidence attested the incident had a negative impact on P.T. and counsel's strategy was apparently to argue Sampson was a model inmate, nothing had changed regarding Sampson, and counsel was prepared to argue that a higher sentence would be vindictive. (ECF No. 99 at 27-29.) They contend Sampson is not prejudiced because the sentencing court heard Roitman's testimony about P.T.'s ODD and related issues at trial, which included details like those Sampson claims his counsel should have addressed in a sentencing memorandum. (*Id.*)

Sampson contends this Court may consider documents (ECF Nos 18-1, 18-2) for this claim because they were presented to the state district court during Sampson's state postconviction evidentiary hearing following the first trial. (ECF No. 102 at 32-33.)

Respondents argue that, unlike the documents presented in the first state court postconviction review proceeding, the documents Sampson now submits contain a treatment record that post-dates the encounter with Sampson. (ECF No. 99 at 28-30.) They argue Sampson cannot rely upon his exhibits because he failed to submit them to the state courts to overcome the procedural default and, even if he may rely upon them now, they may not be considered on the merits. (*Id.*)

The Court concludes that it may consider the exhibits because the state-court record shows they were developed during the state court proceedings. During the second trial, the parties stipulated to the admission of P.T.'s "school and psychological records." (ECF No. 35-1 at 6-7.) Defense Exhibit A[26] includes P.T.'s school and psychiatric records and was referred to during Pacult and Roitman's testimony. (*See, e.g.*, ECF No. 37-2 at 18.) P.T.'s records were also admitted as evidence at the subsequent postconviction hearing. (ECF Nos. 71-3 at 18-19, 73-1 at 2.) And the documents contained in the exhibits (ECF Nos. 18-1, 18-2) are included in ECF No. 73-1.

The Court finds Sampson fails to establish a substantial claim that counsel's failure to submit a written opposition to the State's sentencing memorandum fell below an objective standard of reasonableness or competence under prevailing professional norms as the documents he claims should have been submitted were already before the trial court. Based on the testimony and evidence presented at trial, the State's sentencing memorandum, and the law concerning vindictive sentencing, an objectively reasonable attorney could choose, as Sampson's trial counsel did here, to argue at the sentencing hearing that imposition of a lengthier sentence than was imposed after the first trial for the identical offenses would be construed as vindictive because it could not be based on any of Sampson's actions after the original sentencing proceeding.

---

[26](ECF No. 73-1)

Because Sampson has not established a substantial IAC claim under *Strickland*'s deficiency prong, he fails to overcome the procedural default. Ground 6 is dismissed with prejudice as technically unexhausted by procedural default.

### G.      Ground 7—Cumulative Errors of Trial Counsel

Sampson alleges the combined errors of trial counsel adversely affected the outcome of the proceedings, but for counsel's errors there is a reasonable probability of a different result at trial, and concedes he failed to exhaust this claim in his state postconviction review proceeding. (ECF No. 88 at 32.) Respondents contend this claim should be dismissed as procedurally defaulted or alternatively denied as meritless. (ECF No. 99 at 29-31.) They concede cumulative errors of counsel can combine to demonstrate prejudice but argue counsel made no errors here and Sampson was not prejudiced by any of the alleged errors of trial counsel. (*Id.*)

Although IAC claims are examined separately to determine whether counsel was deficient, the purpose of the Sixth Amendment's guarantee to counsel "is simply to ensure that criminal defendants receive a fair trial" and "that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding." *Strickland*, 466 U.S. at 689, 691-92. "[T]he performance inquiry must be whether counsel's assistance was reasonable *considering all the circumstances." Id.* at 688 (emphasis added); *see also Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005) ("Prejudice may result from the cumulative impact of multiple deficiencies.") (quoting *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978)). The Ninth Circuit held that "[w]hile an individual claiming IAC 'must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment,'" the court "considers counsel's conduct *as a whole* to determine whether it was constitutionally adequate." *Browning v. Baker*, 875 F.3d 444, 471 (9th Cir. 2017) (emphasis in original) (quoting *Strickland*, 466 U.S. at 690).

On consideration of the merits of Sampson's IAC claims, the Court concludes he does not show a substantial claim that trial counsel's actions or omissions were overall

prejudicial even if he made a substantial claim of ineffective assistance for failing to object to the use of Sampson's admission of the firearm offense for purpose of overcoming the default of Ground 4 under *Martinez*. Because Sampson has not overcome the procedural default of this claim, Ground 7 is dismissed with prejudice as technically exhausted by procedural default.

### H.    Ground 8—IAC—Evidence of Acquitted Conduct

Sampson alleges trial counsel provided ineffective assistance in violation of the Sixth Amendment by failing to move to exclude evidence of Sampson's use and possession of a firearm during the commission of the offenses, on the grounds that such admission would violate the issue-preclusion component of the Double Jeopardy Clause given the first jury acquitted Sampson of each allegation of possession and use of a firearm during the commission of the offenses. (ECF No. 88 at 32-37.) He argues the State presented a theory at the second trial that centered on Sampson's possession and use of a firearm to prove coercion and force for the charged acts, even though it did not charge him with the deadly weapon enhancements during the second trial. (*Id.*) Respondents argue counsel's performance was neither deficient nor prejudicial because none of the charges required the use of a firearm and the jury could have grounded its consideration whether Sampson was guilty of the crimes without considering whether he used a firearm. (ECF No. 99 at 31-33.)

### 1.    Additional Background

During the first trial, Sampson was accused of "using a deadly weapon, to-wit: a firearm, during the commission of" the offenses alleged in Counts 1-5, i.e., First-Degree Kidnapping, two counts of Lewdness With a Child Under the Age of 14 Years, Attempted Sexual Assault With a Minor Under 14 Years of Age, and Sexual Assault With a Minor

Under 14 Years of Age.[27] The first jury convicted Sampson of the offenses, but acquitted him of using the firearm during the commission of the offenses.[28]

For the second trial, the State charged Sampson with Counts 1-5 but omitted the allegation that he used a firearm during the commission of those offenses. (ECF No. 33-4.) The State presented evidence and argument throughout the trial that Sampson brandished a firearm at P.T., and due to the presence of the firearm, P.T. was afraid of Sampson. (*See, e.g.*, ECF Nos. 35-1 at 57-59, 84, 128, 142-43, 177, 188; 36-1 at 31-32, 35, 56, 160-62, 198-99; 37-4 at 8, 10, 14, 17, 23, 33-35.)

### 2.    Standards for Evaluating Issue-Preclusion

"Collateral estoppel, or issue preclusion, 'means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.'" *Santamaria v. Horsley*, 133 F.3d 1242, 1244-45 (9th Cir. 1998) (quoting *Ashe v. Swenson*, 397 U.S. 436, 443 (1970)). The issue preclusion, or collateral estoppel, aspect of double jeopardy "precludes the Government from relitigating any issue that was necessarily decided by a jury's acquittal in a prior trial." *Lemke v. Ryan*, 719 F.3d 1093, 1099 (9th Cir. 2013) (citing *Yeager v. United States,* 557 U.S. 110, 119 (2009); s*ee also Currier v. Virginia*, 585 U.S. 493, 499-500 (2018) (explaining that, under the Double Jeopardy Clause, relitigation of an issue at a second trial will only amount to the impermissible relitigation of an offense if to secure a conviction, the prosecution must prevail on an issue the jury necessarily resolved in the defendant's favor in the first trial by virtue of acquittal).

To decide whether an issue was necessarily decided by a jury, a court must "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose

---

[27]Case No. 3:11-cv-00019-LRH-WGC (ECF No. 12-10 at 6-8).

[28]Case No. 3:11-cv-00019-LRH-WGC (ECF No. 12-12).

from consideration." *Lemke*, 719 F.3d at 1104 (quoting *Ashe*, 397 U.S. at 444 (internal quotation marks and footnote omitted)). "[S]o long as a reasonable jury 'could have' based its decision on facts that would not create a double jeopardy violation, the subsequent prosecution may move forward." *Wilkerson v. Superintendent Fayette SCI*, 871 F.3d 221, 233 (3d Cir. 2017) (quoting *Ashe*, 397 U.S. at 444); *see also Santamaria*, 133 F.3d at 1247 ("collateral estoppel does not 'exclude in all circumstances . . . relevant and probative evidence that is otherwise admissible under the Rules of Evidence simply because it relates to alleged criminal conduct for which a defendant has been acquitted.'" (quoting *Dowling v. United States,* 493 U.S. 342, 348 (1990))).

In *Santamaria,* a jury found the defendant guilty of murder and robbery but "not true" a sentence enhancement for using a knife in the commission of a felony. 133 F.3d at 1244. The murder conviction was reversed. *See id.* On retrial, defendant sought to preclude the State from retrying him on the theory he used a knife to kill the victim. *See id.* at 1247. The Ninth Circuit Court of Appeals concluded, because the State was not required on retrial to prove beyond a reasonable doubt that the defendant used a knife in order to convict him of murder under state law, the State was not precluded from presenting evidence the defendant stabbed the victim. *See id.*

### 3.      Analysis of Ground 8

Sampson fails to allege a substantial claim that trial counsel was ineffective for failing to object that the State's use of evidence that Sampson used a firearm during the offenses violated the issue preclusion component of double jeopardy. For trial counsel's objection to have merit, the record would need to establish (1) the issue the first jury necessarily decided was in Sampson's favor, and (2) the State was required to prevail on that issue during Sampson's second trial to secure a conviction. *See Currier*, 585 U.S. at 499-500. Assuming trial counsel had objected, there is no reasonable probability the result of the trial would have been different because the objection is wholly without merit.

Based on the elements of the offenses contained in the instructions to the jury at the second trial, the State was not required to prove use of a firearm or deadly weapon during the commission of the offenses. First-Degree Kidnapping does not require the use of a firearm, and the State could establish the offense by proving Sampson willfully enticed P.T. to his residence, confined him by tying him to a chair, and did so with the intent to hold or detain, or by holding and detaining P.T. (ECF No. 37-1 at 8-10.)  It was not necessary to prove Sampson used a firearm during the commission of Sexual Assault and Attempted Sexual Assault. (*Id.* at 11, 13-15.) The State could establish Sexual Assault by showing, due to P.T.'s size and age,[29] Sampson knew or should have known, P.T. was mentally or physically incapable of resisting Sampson and P.T. submitted due to fear of serious bodily injury. P.T. testified he felt he could not run away or refuse Sampson's requests as Sampson was larger than P.T. and P.T. was inside Sampson's house. Lewdness with a Minor does not require force. (*Id.* at 12.)

A reasonable jury could have rested Sampson's convictions on facts that would not create a double jeopardy violation. An objection from trial counsel that the State violated the issue-preclusion component of the Double Jeopardy Clause lacked merit. Ground 8 is dismissed with prejudice as technically exhausted by procedural default.

## V.  CERTIFICATE OF APPEALABILITY

This is a final order adverse to Sampson. Rule 11 of the Rules Governing Section 2254 Cases requires the Court to issue or deny a COA. Therefore, the Court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002). Under 28 U.S.C. § 2253(c)(2), a COA may issue only when a petitioner made "a substantial showing of the denial of a constitutional right." For claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's

---

[29]Metro Detective Nelson testified that P.T. was 4'6" and weighed 85 pounds on the day of the incident. (ECF No. 35-1 at 144.)

assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA issues only if reasonable jurists could debate whether (1) the petition states a valid claim of the denial of a constitutional right, and (2) this Court's procedural ruling was correct. *Id.* Applying these standards, a COA is warranted for Grounds 4 and 8.

## VI.    CONCLUSION[30]

It is hereby ordered that the Third Amended Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 (ECF No. 88) is granted on Ground 5. Petitioner Willie Sampson's judgment entered on September 28, 2017, in Case No. C-02-182432-1 in the Eighth Judicial District in and for Clark County, Nevada,[31] is hereby vacated. Within 60 days[32] of the later of (1) the conclusion of any proceedings seeking appellate or certiorari review of this Court's judgment, if affirmed; or (2) the expiration for seeking such appeal or review, the state district court in the Eighth Judicial District, in and for Clark County, Nevada, is directed to enter an amended judgment in Case No. C-02-182432-1, imposing sentences identical to those previously imposed against Sampson in that case in the judgment that was entered on June 16, 2003.[33]

It is further ordered that Grounds 1-4 and 6-8 of the Petition are dismissed with prejudice as technically exhausted by procedural default.

It is further ordered that all requests for an evidentiary hearing are denied.

It is further ordered that a Certificate of Appealability is granted for Grounds 4 and 8 and denied for all other grounds in the Petition.

---

[30]The Court notes the parties made arguments and cited cases not discussed above. The Court reviewed these arguments and cases and determined they do not warrant discussion as they do not affect the outcome of the issues before the Court.

[31](ECF No. 37-9.)

[32]Reasonable requests for modification of this time may be made by either party.

[33](ECF No. 31-5 at 11-12.)

It is further ordered that the Clerk of Court substitute John Henley for respondent Nathanjah Breitenbach.

It is further ordered that the Clerk of Court is directed to enter judgment accordingly and close this case.

DATED THIS 17th Day of March, 2026.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE

58